657 A.2d 31

Joseph A. GALLAGHER, Appellant,

v.

FIDELCOR, INC., Appellee.

Superior Court of Pennsylvania.

Argued Feb. 7, 1995.

Filed April 12, 1995.

Pamela Tobin, Philadelphia, for appellant.

Alfred W. Putnam, Jr., Philadelphia, for appellee.

Before CIRILLO, OLSZEWSKI and HESTER, JJ.

OLSZEWSKI, Judge:

In the mid–1980's, F. Robert Dieter and appellant Joseph A. Gallagher, as President/Chief Operating Officer and Chairman of Industrial Valley Bank (IVB), respectively, conducted merger negotiations with appellee Fidelcor. As a part of these negotiations, Gallagher and Dieter made provisions for their own employment at the post-merger Fidelcor. In March of 1986, the merger was completed and IVB was taken over by Fidelcor. On March 31, 1986, Gallagher and Dieter signed new employment agreements with Fidelcor and began working for the new company.

On December 31, 1989, Gallagher retired from Fidelcor; pursuant to section 6 of his employment agreement (Agreement), he began to receive retirement benefits totalling $235,-000 annually. On March 11, 1991, Gallagher filed suit against Fidelcor seeking a benefit increase. Gallagher claimed that Fidelcor was not correctly computing his retirement benefits because it was undervaluing his averaged "Annual Compensation" under the terms of the Agreement. More specifically, Gallagher asserted that certain income derived from the exercise of company stock options should be included in the computation of his "Annual Compensation."

On November 24, 1993, Fidelcor moved for summary judgment. Gallagher answered by cross-claiming for summary judgment on December 14, 1993. The Honorable Richard S. Lowe agreed with Fidelcor that the income from the exercise of stock options was not contemplated by the term "Annual

Compensation" and granted summary judgment in Fidelcor's favor. This appeal followed.

The contract clause at issue here reads:

6. Beginning upon such date ... upon Executive's retirement ... and continuing for the duration of Executive's life, company agrees to pay Executive each month a retirement allowance ... equal to one-twelfth ($\frac{1}{12}$) of the higher of (i) fifty percent (50%) of Executive's average Annual Compensation (including salary, bonuses and incentive compensation ...) received by Executive during the five (5) consecutive years of his active employment with the company ... in which he received the highest Annual Compensation ... or (ii) ... $235,000 ... less the monthly amount, if any, payable under the company's retirement plan....

R.R. at 9a. Under Gallagher's reading of this clause, income derived from the exercise of stock options comes within the term "Annual Compensation." If this income is included, his average Annual Compensation in his five highest years[1] equals $860,855, fifty percent of which is $430,427.50. Since this is higher than the minimum amount of $235,000, Gallagher asserts that he should be paid approximately $430,500 annually pursuant to section 6(i). In contrast, Fidelcor does not include the income from the exercise of stock options in its computation of Annual Compensation. Therefore, its figure for the average Annual Compensation of Gallagher's five highest years is $420,281, fifty percent of which is slightly less than $235,000. Thus, Fidelcor has been paying Gallagher $235,000 pursuant to the minimum amount set forth in section 6(ii).

The trial court found that the terms of the Agreement were unambiguous. Therefore, the terms are to be construed by the court as a matter of law. *Community College v. Society of the Faculty*, 473 Pa. 576, 592, 375 A.2d 1267, 1275 (1977); *Marcinak v. S.E. Greene School District*, 375 Pa.Super. 486, 490–92, 544 A.2d 1025, 1027 (1988). In so

1. The parties do not dispute that Dieter's five highest earning years are 1985–1989.

doing, a court must be guided by the paramount goal of contract interpretation: "to ascertain and give effect to the parties' intent." *Laudig v. Laudig*, 425 Pa.Super. 228, 233, 624 A.2d 651, 653 (1993); *Archer v. State Farm Insurance Co.*, 419 Pa.Super. 558, 566, 615 A.2d 779, 783 (1992), *alloc. denied*, 535 Pa. 612, 629 A.2d 1375 (1992). This intent must be ascertained from the language of the written agreement. *Steuart v. McChesney*, 498 Pa. 45, 48–51, 444 A.2d 659, 661–62 (1982); *Archer*, 419 Pa.Super. at 564–66, 615 A.2d at 783; *Warren v. Greenfield*, 407 Pa.Super. 600, 605–07, 595 A.2d 1308, 1311 (1991). "In the absence of technical terminology, we give the words used in the agreement their plain and ordinary meaning." *Id.*

■ Gallagher's appeal centers around the meaning of the terms "Annual Compensation" and "incentive compensation" as used in section 6 of the Agreement. Section 6 states that retirement benefits will be calculated based on the executive's "Annual Compensation (including salary, bonuses, and incentive compensation)." Salary, bonuses, and incentive compensation act as parenthetical modifiers, listing certain types of income that may be Annual Compensation. The focus, however, must remain on Annual Compensation, which is the unit ultimately being measured. It is not enough to assert, as Gallagher does, that certain income is incentive compensation. The terms salary, bonuses, and incentive compensation do not stand on their own. There are assuredly certain types of incentive compensation that cannot fairly be called "Annual Compensation," and these types were not meant to be included in the computation. If these terms were meant to add to the term "Annual Compensation," they would have been listed separately, rather than added as a parenthetical after Annual Compensation. Thus, the relevant issue remains whether income realized from the exercise of stock options is Annual Compensation.

The act of granting stock options could fall within this provision, as it is arguably both annual and compensatory. Since the primary purpose of stock option grants is to compensate employees, these non-cash grants do come under a

fair and normal definition of the term "compensation." Furthermore, options are granted on an annual basis. Therefore, notwithstanding valuation problems, it is at least arguable that the granting of stock options is Annual Compensation within the meaning of this section. As persuasive as this argument is, however, it is irrelevant to our inquiry because Gallagher is not asserting that the stock options are Annual Compensation. Instead, Gallagher is arguing that the income realized from the exercise of the stock options in later years is Annual Compensation.

In contrast to the annual nature of the grant of a stock option, the exercise of a stock option can occur at any future time, at the sole discretion of the employee. Even if the exercise of the option and the resulting transfer of stock from employer to employee is an act of compensation, there is nothing annual about it. An employee may exercise his or her options annually, or may save them and exercise them all at once in some future year. Given the sporadic and unpredictable nature of the act of exercising stock options, it would require a very strained reading of the term "Annual" to fit the exercise of stock options within this clause.

In addition to the non-annual nature of the act of exercising stock options, Gallagher's interpretation of Annual Compensation would produce a completely unreasonable result. If Gallagher's reading of this clause prevailed, he could unilaterally manipulate the amount of his retirement benefits. Gallagher could hold his options, wait for stock prices to soar, and exercise the options all at once. Thus, the company would be forced to include, as part of Gallagher's Annual Compensation, all of the profit accrued since the date of the actual stock option grant.

The inequity of this result is illustrated by analogizing to a scheme where Fidelcor gives Gallagher actual shares of stock, rather than stock options. If these shares are to be deemed annual compensation, they would have to be valued in the year they are granted, rather than several years later when they are sold at a profit. It is unreasonable to assume that the company would agree to such a radical formula that gives an

employee this much control without any specific discussion in the Agreement.[2]

■ Gallagher attempts to bolster his position by pointing to the fact that the income derived from the exercise of the stock options is treated as compensation for tax purposes and wages for Pennsylvania Wage Payment and Collection Law purposes. The issue in this case, however, is the parties' intent, which is determined by the law of contracts, and not by tax or employment law.

■■ Gallagher also asserts that retirement agreements must be construed in favor of the employee and against the employer/drafter. As a general rule, agreements will be construed against the drafter when terms are ambiguous. *E.g.*, *Raiken v. Mellon*, 399 Pa.Super. 192, 196–98, 582 A.2d 11, 13 (1990). When terms are clear and unambiguous, however, courts must adhere to the written language of the agreement. *Id.* We find that the term "Annual Compensation" is sufficiently clear and unambiguous that the court need not resort to cannons of interpretation, such as construing the Agreement against the drafter.

■ Even if we were to assume that there was another reasonable interpretation of Annual Compensation, we would not automatically construe this Agreement against Fidelcor. While the rule that agreements are to be construed against the employer may be true in cases of general retirement plans that are presented to employees on a take-it or leave-it basis, it is not necessarily the case when the employee is in a position to negotiate for his or her benefits. *Cf. Levitt v. Billy Penn Corp.*, 219 Pa.Super. 499, 283 A.2d 873 (1971) (construing a retirement agreement against the employer and emphasizing that the agreement was presented to the employees on a take-it or leave-it basis).

**2.** If the parties truly intended to include income from the exercise of stock options in the calculation of retirement benefits, it would have been a very simple matter to add a specific reference to this type of income in the benefit calculation formula.

In the present case, Gallagher negotiated his employment contract at a time when he had a great deal of bargaining power. Gallagher was the Board Chairman of a target company. Since a merger is much easier when target management is cooperative, it was in Fidelcor's interests to make certain concessions to Gallagher. In this situation, we cannot assume that Gallagher was presented a standard take-it or leave-it contract. In fact, Gallagher admits that he specifically negotiated this Agreement to be similar to his prior agreement with IVB. In this case, we have two parties bargaining from positions of relatively equal strength, and we must construe the contract accordingly.

Since we agree that the language of this Agreement was unambiguous, and that Fidelcor's reading of the term "Annual Compensation" is more consistent with the parties' manifested intent, we find that the trial court properly entered summary judgment against Gallagher.

Order affirmed.