**In re Matthew P. VERDI, Debtor.**

**No. 99–19425DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 10, 2000.

Ronald Beifeld, Plymouth Meeting, PA, for debtor.

Mary Ellen O'Laughlin, David B. Aaronson, Mesirov Gelman Jaffe, Cramer & Jamieson, LLP, Philadelphia, PA, for the Walheim Group.

Edward Sparkman, Philadelphia, PA, for Standing Chapter 13 trustee.

Lawrence J. Lichtenstein, Haddonfield, NJ, for Former Chapter 7 trustee.

Danielle Tribuiani, Obermayer Rebmann Maxwell & Hippel, Philadelphia, PA, for Former Chapter 7 trustee.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, for United States trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant decision resolves the merits of objections ("the Objections") of MATTHEW P. VERDI ("the Debtor") to the proof of claim ("the Claim") of the WALHEIM GROUP ("Walheim"), a tax accounting firm which succeeded the Debtor's long-time former employer, O'REILLY AND WHITE, INC. ("O'Reilly"), asserting damages for certain alleged breaches of restrictive covenants contained in the Debtor's employment contracts with O'Reilly dating back to the 1960's. We find herein that the Claim, originally asserted in the amount of $305,863, must be disallowed in its entirety because Walheim failed to prove adequate consideration for the covenants. For this reason, we need not liquidate the amount of the Claim, nor we will allow Walheim's request to keep the record on the Objection open for this purpose.

Although this decision eliminates the only contested claim raised by the Debtor's two disclosed pre-petition creditors, and renders him eligible for Chapter 13, the order accompanying our Opinion of December 10, 1999, now reported at 241 B.R. 851 ("*Verdi I*"), obliges the Debtor to remain in Chapter 13 to liquidate the likely administrative claims of the former Chapter 7 Trustee and his counsel arising from his initial failures to disclose his assets, conduct which we found in *Verdi I* constituted "bad faith." However this finding does not enhance the validity of Walheim's Claim, and the Code appears not to contemplate its right to any administrative claims in consideration of its efforts to bring to light the Debtor's improprieties. *See* 11 U.S.C. § 503(b)(3).

### B. FACTUAL AND PROCEDURAL HISTORY

*Verdi I*, 241 B.R. at 853–56, provides a lengthy recitation of the facts and proce-

dural history arising out of the instant individual voluntary bankruptcy case, filed under Chapter 7 of the Bankruptcy Code on July 23, 1999. Therein, we noted the Debtor's "stubborn, uncooperative" bad faith actions, *id.* at 857, which, as Walheim and the interim Chapter 7 trustee, LAWRENCE J. LICHTENSTEIN, ESQUIRE ("the Trustee"), and the latter's counsel established, included the Debtor's failure to disclose significant assets. *See id.* at 855. The revelation of the Debtor's misconduct caused the Debtor to, first, move to voluntarily dismiss the case, and then to seek to convert it to a Chapter 13 case. *Id.* at 854. In *Verdi I,* from which there has been no appeal, we held, *inter alia,* that, despite the Debtor's bad faith actions, he would be given an opportunity to utilize Chapter 13 of the Bankruptcy Code in a manner that did not unfairly prejudice any other interested party, provided he (1) met the debt limit for Chapter 13; (2) promptly prepared a confirmable plan; (3) paid the allowed fees of the Trustee and his counsel as administrative claims; and (4) satisfied other conditions imposed by this court. *Id.* at 859–60. The order accompanying *Verdi I* also directed the Debtor to file and serve all necessary Chapter 13 Schedules and Statements and, in order to resolve the debt-limit issue and assure a prompt resolution of the validity of the claim which has driven this case since its outset, file any objections to the Claim on or before December 17, 1999. Finally, it scheduled a hearing on any objections, filed, on January 5, 2000.

The Debtor apparently followed these directives. Although Walheim filed the Claim, totaling $305,863 based upon an alleged breach of an employment contract, on December 6, 1999, the Debtor was unaware of this filing when he filed the Objections. Hence, the Objections only referenced Walheim's pre-petition suit and the Debtor's defenses to the claims asserted in that suit.

At the hearing on the Objections of January 5, 2000, testimony was adduced from JON WALHEIM ("JW"), Walheim's current vice-president; Anthony DellaMonica, a long-time former office manager and vice-president of O'Reilly and later Walheim; and the Debtor himself. The testimony provided by the parties focused on the enforceability of an April 1, 1960, written employment contract (the "Employment Agreement") between O'Reilly and the Debtor, the validity of the Claim based on the Employment Agreement, and the total dollar figure of the Claim. Walheim's evidence at the hearing consisted of the following:

(1) Copies of the Employment Agreement and the subsequent modifications to the same of November 24, 1961, and June 21, 1968. *See* W–1;

(2) The Debtor's April 30, 1992, letter of resignation to from Walheim's employ. *See* W–2;

(3) The Debtor's federal income tax returns and schedules for the years 1995, 1996, 1997, and 1998, which were all that he had produced. *See* W–4; W–5; and W–6; and

(4) Lists, charts, affidavits, checks, receipts, and formulae itemizing payments by individuals, entities, and the former Walheim clients allegedly serviced by the Debtor for the years 1990 through 1995, and the amount of monies misappropriated by the latter during the six-year period under scrutiny. *See* W–3, W–8 (Schedules 1 through 4), W–9, W–10a, W–10b, W–11, and W–12.

As a principal of the purchaser of the O'Reilly firm in 1990, JW provided no direct testimony about the execution of the Employment Agreement with O'Reilly and its modifications. He did produce a written Assignment of the Employment Agreement and the 1968 modification from O'Reilly to Walheim dated January 2, 1990.

Paragraph 4 of the Employment Agreement restricted O'Reilly's employees from doing any "side work" of the same nature

as their work at O'Reilly. That paragraph applied similar restrictions for a period of three years after the termination of employment, precluding former employees from soliciting or rendering tax accounting services for O'Reilly clients.

The Employment Agreement also provided that the Debtor-employee is to be compensated

(a) On each account originally solicited, obtained and installed by EMPLOYEE for EMPLOYER, the sum of forth percent (40%) of the total service charges paid by such account to EMPLOYER during a period of one year after the date of installation of such account as shown by the books of EMPLOYER.

· (b) On each account services by EMPLOYEE, whether or not such account was originally solicited, obtained or installed by EMPLOYEE, the sum of thirty percent (30%) of all service charges paid by such accounts to EMPLOYER for service performed by EMPLOYEE....

The only recitation as to consideration for the Employment Agreement included therein is a statement that

WHEREAS, EMPLOYEE would not be employed by EMPLOYER nor would his employment be continued unless he enters into this agreement, which employment or continuance in employment is part of the consideration for the execution hereof; ...

As to its assignability, the Employment Agreement provides, at paragraph 10, that

[t]his agreement shall be binding upon and inure to the benefits of the parties hereto, their heirs, executors, administrators, successors and assigns, ...

The subsequent modifications merely revise the compensation provisions. In the 1968 modification, that provision is amended to entitle the Debtor to receive

a. Fifty percent (50%) of all fees received for the preparation of Federal Income Tax Returns prepared by said EMPLOYEE.

b. On each account originally solicited, obtained ·and installed by EMPLOYEE for EMPLOYER, forty percent (40%) of the total installation fee (as hereinafter defined) plus forty percent (50%) of the monthly service. fees contracted to be paid by such accounts for the first twelve (12) months service rendered or to be rendered such accounts by EMPLOYER, whether such fees are for services performed before or after the date of installation....

c. On each account services by EMPLOYEE, whether or not such account was originally solicited, obtained or installed by EMPLOYEE thirty-two and one-half percent ($32\frac{1}{2}$%) of all service charges paid by such account to EMPLOYER for services rendered....

According to JW, the Debtor knew that the Employment Agreement prohibited him from doing any side accounts while working at O'Reilly, but nevertheless the Debtor kept and serviced several side accounts throughout the term of his employment. In JW's words, Trial Transcript, January 5, 2000, Volume 1 ("T1"), at 54,

We found in certain instances where [the Debtor] would be preparing a tax return for a client, and he would have the client make half the payment to him and half the payment to the firm, and he would have—and he would only remit the payment to the firm into the firm and the other one he kept for himself. We found instances where he just—if it was an incorporated client where he was saying we didn't necessarily do the individual tax work, he was having the client write a check to him directly.

We found out that he was getting paid cash for a lot of tax work and none of those funds were coming into the firm, and as far as the other work—we didn't really get into a lot of the discovery of terms of which clients he actually took and didn't take because when we deposed him, he filed for bankruptcy.

As a result, JW claimed that the Debtor obtained about $33,225 in side account fees between 1990 and 1992 while working at Walheim. According to JW, since the Debtor charged his side account clients much less than the amount that would have been charged to them had the services been performed through Walheim, JW adjusted his calculations of Walheim's damages caused by the Debtor's misappropriations to double the amount which the Debtor obtained from these clients in Walheim's calculation of damages.

JW further testified that the Debtor was also precluded by the Employment Agreement from servicing the same former Walheim accounts in the three-year period following termination of his employment. He thus testified that, despite knowing of those restrictions, the Debtor solicited these and various other Walheim clients whom he had serviced while employed at the firm.

JW continued, in his testimony, to note that several Walheim clients that were serviced by the Debtor during the latter's tenure stopped hiring Walheim for these services after the Debtor terminated his employment. JW testified that, in his opinion, these clients were potentially "stolen" from Walheim by the Debtor.

From all of the foregoing, Walheim computed the Claim, as revised, at $201,630.70 on the present record, pursuant to a Table attached to its Opening Brief and here as Appendix "A." The claim for attorneys' fees is based not on any term of the Employment Agreement, but on Federal Rule of Bankruptcy Procedure 9011, arising from the Debtor's misconduct in the pre-*Verdi I* stages of the case. Walheim also requested that the record be kept open to allow it to supplement the record, presently including only the Debtor's tax returns from 1995 and thereafter already produced, with those from 1990 through 1994 to allow it to more accurately calculate the full amount of its alleged damages for breach of the Employment Agreement.

Della Monica was called by the Debtor and testified that, during his tenure as vice-president since his hire in the early 1950's under prior management which included JW's ancestors, field accountants like the Debtor were *allowed* to service side accounts, even though paragraph 4 of the Employment Agreement expressly restricted such activity. DellaMonica further testified that he presumed that all of the field accountants at O'Reilly and later Walheim engaged in this type of activity, and he claimed that this was not only known, but also was openly tolerated, by himself and the former owner/president of the firm, Felix Schina, and O'Reilly's board members, including JW's ancestors. In DellaMonica's opinion, these practices did not change under Walheim.

Regarding the Employment Agreement and similar agreements signed by other field accountants in 1960, DellaMonica stated that their preparation by O'Reilly occurred after another employee "took the accounts and serviced them himself and they canceled with [O'Reilly] and he started his own practice," resulting in a lawsuit. Trial Testimony, January 5, 2000, Volume 2 ("T2"), at 7. His testimony continued as follows:

[by Mr. Beifeld, counsel for the Debtor] ... So because of that litigation—

. . .

A [by DellaMonica] They came out with the new contracts, it was drawn up. . . .

A I think it was ... Bill McGinnis [who] drew it up, . . .

... the attorney for [O'Reilly] ...

Q Do you know how the contract was presented to the employees, the field accounts [sic] when it was finished?

A It was individual [sic], one was called up to Mr. White's office and more or less signed it. We were all kids then and we didn't know what we were doing really. . . .

THE COURT: ... Are you suggesting that the people that signed these didn't know what they were doing?

THE WITNESS: The people only really signed the contract with the theory of if they didn't sign it, they would lose their jobs....

BY MR. BEIFELD:

Q. It's your understanding though, or you tell me if I'm wrong, that if they did not sign the contract, would they have been terminated from employment?

A. My understanding that was the attitude, yes....

T2, at 7–9.

On cross-examination, the following colloquy occurred:

Q. [by Walheim's counsel] Do you know whether or not there were any changes in salaries or commission rates between 1952 and 1960 for the field accountants?

A. [by DellaMonica] No, I think it was still at the old rate, 37 and a half percent.

Q. Okay. Do you know if that changed at any time?

A. It changed after they signed in '60 I think it was.

Q.‘ After they signed the employment agreements?

A. Yeah....

THE COURT: What did it change to?

THE WITNESS: It was 42 and a half percent....

T2, at 21–22.

We find that, throughout his direct and cross-examination testimony, DellaMonica presented himself as a competent and credible witness. In fact, he was the only disinterested witness to testify, and there appeared to be no reason for him to favor or disfavor either party to the dispute.

Finally, the Debtor testified at great length about the employment arrangement at O'Reilly, his servicing of the various side accounts during his tenure, and the handling of other accounts following termination of his employment within the three-year period of restriction. According to the Debtor, he started working at O'Reilly in January, 1952. Although he testified that he had executed a written employment contract of some sort when he began his employment, the terms of any such agreement were not disclosed in this record.

The Debtor thusly testified, similarly to DellaMonica, in a manner suggesting that the restrictive covenants added to the Employment Agreement were the main and perhaps only feature different from those of any of its predecessors:

Q [by Mr. Beifeld]. In your instance, how was the contract presented to you?

A [by the Debtor]. They put it on the front of [Mr. Schina's] desk and they [Schina, Peter Walheim, JW's grandfather, and Mr. McGuiness] said here is a new contract, Matt, sign it. I said well, if I don't sign it, what happens? Well, you've got to have a contract to work with us.

Q. Is that it?

A. So that left me with the impression that I had to sign or it was the end of my employment with the company.

Q. Did you read it?

A. At the time, not thoroughly.

Q. Did you ask for an opportunity—

A. I asked if I could take it out of the room and they said no, I couldn't remove it from the premises.

T2, at 31–32.

The Debtor acknowledged the existence of the restrictive covenant embodied in paragraph 4 of the Employment Agreement, and admitted that, despite this covenant, he serviced various side accounts during his tenure. However, the Debtor claimed that it was common knowledge among the field accountants at the firm that such services were widely performed by the accountants and that no actions were taken by the management to prevent this conduct, causing him to assume that these actions were not in violation of his employment relationship.

In like manner, the Debtor admitted to servicing various Walheim clients following the termination of his employment within the three-year period of the restrictive covenants. However, contrary to JW's observations, the Debtor stated that he did not solicit, take, nor steal any of Walheim's clients, but that he "was approached by the people who wanted me to do their work." T2, at 37.

The Debtor also offered far different figures earned from these side accounts than those introduced by JW. According to the Debtor, several of fifteen (15) individuals and entities identified by JW were never serviced by him as side account clients during his tenure at Walheim. He also disputed the dollar figures claimed by JW for most of the others.

Although the Debtor's evidence did not result in a precise mathematical calculation of the dollar amount figures received from the side account services provided over the six-year period under scrutiny, nevertheless his direct and cross-examination testimony supported a significant reduction of the $201,630.70 dollar figure referenced by JW.

After completion of the hearing, we entered an Order inviting the parties to file simultaneous opening briefs in support of their respective positions on or before January 18, 2000, and reply briefs on or before January 25, 2000. Both parties complied with these deadlines in rendering their opening briefs, although only Walheim chose to file a reply brief.

In his brief the Debtor argued that the Employment Agreement between the parties is invalid and unenforceable. Alternatively, the Debtor contended that Walheim should be estopped from enforcing the restrictive covenant embodied in the Employment Agreement as a result of its and O'Reilly's continuous acquiescence in allowing the conduct at issue.

Walheim, on the other hand, argued that the Debtor failed to sustain his burden of controverting the Claim, and therefore the Objections must be overruled. Further, Walheim asserted that the Employment Agreement is a valid, totally enforceable contract, and that, even if were it not totally enforceable because it was found unreasonable in scope and time, it was enforceable against the Debtor in an action for damages, citing *Boyce v. Smith–Edwards–Dunlap Co.*, 398 Pa.Super. 345, 358–59, 580 A.2d 1382, 1388–89 (1990), *appeal dismissal*, 527 Pa. 639, 593 A.2d 413 (1991).

## C. DISCUSSION

At the outset, we address the issue of what matters are before us for decision and the parties' burdens of proof relative thereto in light of some apparent confusion on Walheim's part on this score. In its opening brief, for instance, Walheim appeared to suggest that the Debtor failed to present any evidence which rebutted the validity of the Claim, specifically the validity of the Employment Agreement.

To the contrary, we find that the Debtor made clear his intention to challenge all aspects of the Claim, including the enforceability of the restrictive covenants therein, at least as early as during the course of the hearing on the Trustee's motion to convert this case to Chapter 7 on November 16, 1999, decided in *Verdi I*, and argued consistently thereafter that the restrictive covenants in the Agreement were unenforceable as a matter of law. Therefore, it was clear at all times that the validity of all aspects of the Agreement was at issue.

■ As we stated in *In re Giordano*, 234 B.R. 645, 650, *reconsideration denied*, 1999 WL 527717 (Bankr.E.D.Pa. July 20, 1999),

[i]n litigation involving objections to proof of claim, once the objector presents evidence disputing any aspect of the claim, the claimant must prove facts sufficient to support the challenged aspect of the claim. As stated in [*In re*]

*Galloway*, ..., 220 B.R. [236,] at 243–44 [ (Bankr.E.D.Pa.1998) ],

> "[u]pon filing an objection, the Debtor bears the burden of going forward and presenting evidence to rebut or cast doubt upon, the creditor's proof of claim. The Debtor's burden is to produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim ... by a preponderance of the evidence."

*See also In re Allegheny Int'l*, 954 F.2d 167, 173–74 (3d Cir.1992); and *In re Lewis*, 80 B.R. 39, 40 (Bankr.E.D.Pa. 1987).

The evidence presented at the hearing of January 5, 2000, on the Objections, raised evidence which tended to rebut or cast doubt upon all aspects of Walheim's claim, including the enforceability of the restrictive covenants at issue, by challenging the Agreement's enforceability as a matter of law. Walheim therefore had the burden, as it would have had as a plaintiff in a suit outside of bankruptcy, of proving all aspects of its claim by a preponderance of the evidence.

Although alternative issues are presented by the Debtor, we will focus on the issue of whether the restrictive covenants in issue were supported by good and valuable consideration under applicable law and are therefore binding on the Debtor. If they are not, we do not need to consider further arguments or ascertain the property amount of Walheim's claim.

We nevertheless will briefly reference all of the arguments raised by the Debtor in his brief. The Debtor argued, with respect to the issue of consideration, that the Employment Agreement between the parties is invalid and unenforceable, because, *inter alia*, there was no adequate consideration provided in the parties' Em-

ployment Agreement for the imposition of the restrictive covenant at hand, citing *Gagliardi Brothers, Inc. v. Caputo*, 538 F.Supp. 525, 528 (E.D.Pa.1982) and *Bilec v. Auburn & Associates, Inc. Pension Trust*, 403 Pa.Super. 176, 183, 588 A.2d 538, 541 (1991), quoting *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 506–07, 351 A.2d 207, 210 (1976).

Noting that restrictive covenants impose restraints on employees' rights, the Debtor further asserted that these covenants should be construed narrowly and that, absent an explicit assignability provision, courts should be hesitant to read them into the contract. In support of this assertion, the Debtor relied on *All–Pak, Inc. v. Johnston*, 694 A.2d 347, 351 (1997), and questioned whether the assignability provisions embodied in paragraph 10 of the Employment Agreement and quoted at page 317 *supra* were explicit enough to meet the *All–Pak* standard.

In addition, the Debtor contended that the restrictive covenants were unenforceable because they not only restricted any given employee from "solicitation," but also restricted third-party clients from utilizing the services of the accountant of their choice. In this contention, the Debtor argued that it is not just the parties to the contract who have an interest in the breadth and reasonableness of the Agreement in question, but also members of the public who want to choose their own accountant.

Further, the Debtor claimed that the language contained in the Employment Agreement was ambiguous. In this regard, the Debtor claimed that, on the one hand, numerous provisions in the Agreement purported to control the behavior of the employee not only during, but also after, their departure from employment; yet, on the other hand, it appeared to confine its effect to the time of actual employment. The Debtor contended that this ambiguity must be construed against Walheim citing *Shehadi v. Northeastern*

*Nat'l Bank of PA.*, 474 Pa. 232, 236, 378 A.2d 304, 306 (1977); and *Gallagher v. Fidelcor, Inc.*, 441 Pa.Super. 223, 229, 657 A.2d 31, 34 (1995). Finally, the Debtor contended that the failure of O'Reilly or Walheim to enforce the covenants estopped them from doing so by acquiescence in the Debtor's conduct, citing *Walnut-Juniper Co. v. McKee, Berger & Mansueto, Inc.*, 236 Pa.Super. 1, 344 A.2d 549 (1975).

Walheim, on the other hand, countered that the Debtor's argument that the Employment Agreement is invalid and unenforceable was irrelevant in light of the evidence at hand. According to Walheim, it was undisputed at the hearing that

(1) the Employment Agreement was in effect at the time the Debtor voluntarily terminated his employment with Walheim;

(2) the Debtor knew that the Employment Agreement prohibited him from servicing side accounts while working at Walheim, but he nevertheless kept and serviced several side accounts throughout his term of employment;

(3) the Debtor knew that the Employment Agreement was in effect at the time of termination, and that it restricted him for a three-year period from soliciting or rendering tax accounting services to Walheim clients; and

(4) the clients listed on the Debtor's 1995, 1996, 1997, and 1998 federal income tax schedules, represent the same clients serviced as side accounts by the Debtor at the time of employment.

Walheim therefore claimed that, through the Debtor's own admissions, it proved each and every element of the Claim, *i.e.*, (1) the existence of a contract, (2) its essential terms, (3) the breaches in question, and (4) the resulting damages. Accordingly, Walheim averred that nothing more was needed to be proved in order that we uphold the validity of the Claim question and cited *Gundlach v. Reinstein*, 924 F.Supp. 684, 688 (E.D.Pa.1996), *aff'd*, 114 F.3d 1172 (3rd Cir.1997), quoting *Cottman*

*Transmission Systems, Inc. v. Melody*, 851 F.Supp. 660, 672 (E.D.Pa.1994), to support this assertion.

Walheim argued that the Debtor's contentions regarding the lack of adequate consideration were without merit. In this regard, Walheim maintained that the Debtor's contentions that there was no consideration provided for the restrictions embodied in the Employment Agreement were contradicted by DellaMonica's hearing testimony. According to Walheim, DellaMonica's testimony, quoted at page 319 *supra*, established that the commission rates for the field accountants at O'Reilly were increased at the time of the signing of the Employment Agreement. Walheim argued that, given his bad faith and lack of credibility generally in his disclosures, the Debtor should not be credited in his testimony that compensation rates were not increased when the Employment Agreement was signed, which it argued was contrary to the testimony of DellaMonica in this respect. Finally, Walheim asserted that the Debtor's anti-assignability arguments failed because paragraph 10 of the Employment Agreement, quoted at page 317 *supra*, expressly stated that the contract terms could be enforced upon assignment.

■ We believe that the Debtor's position with respect to the validity and/or enforceability of the restrictive covenants in question on the ground of lack of consideration is correct and therefore we have no need to address his alternative arguments. The standard by which the validity of Pennsylvania restrictive covenants are judged was thusly set forth by the Pennsylvania Supreme Court in, *e.g.*, *Piercing Pagoda, supra*, 465 Pa. at 506–07, 351 A.2d at 210:

The law in this Commonwealth for more than a century has been that in order to be enforceable a restrictive covenant must satisfy three requirements: (1) the covenant must relate to either a contract for the sale of goodwill or other subject property or to a contract of employment;

(2) the covenant must be supported by adequate consideration; and (3) the application of the covenant must be reasonably limited in both time and territory. *Maintenance Specialties v. Gottus,* 455 Pa. 327, 331, 314 A.2d 279, 281 (1974) (Jones, C.J., concurring); *Jacobson & Co. v. International Environment Corp.,* 427 Pa. 439, 235 A.2d 612 (1967); *Capital Bakers, Inc. v. Townsend,* 426 Pa. 188, 231 A.2d 292 (1967); *Barb–Lee Mobile Frame Co. v. Hoot,* 416 Pa. 222, 206 A.2d 59 (1965); *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957). *See also Restatement of Contracts[,]* § 515(e) (1932).

*See also George W. Kistler, Inc. v. O'Brien,* 464 Pa. 475, 480, 347 A.2d 311, 314 (1975); *Srolowitz v. Roseman,* 263 Pa. 588, 590, 107 A. 322, 323 (1919); *Cleaver v. Lenhart,* 182 Pa. 285, 37 A. 811 (1897); *Volunteer Firemen's Insurance Services, Inc. v. CIGNA,* —— Pa.Super. ——, 693 A.2d 1330, 1337 (1997); and *Insulation Corp. of America v. Brobston,* 446 Pa.Super. 520, 528, 667 A.2d 729, 733 (1995).

The covenants in question may be considered ancillary to an employment contract, since they were part of the Employment Agreement, although not the original terms of the Debtor's employment; and their application may be considered reasonably limited in both time and territory. However, Walheim has clearly failed to prove that they were supported by adequate consideration.

■ Pennsylvania law provides that, when a restrictive covenant is executed after the commencement of employment, the covenant will not be enforced unless it is supported by a new consideration provided at the time of the covenant. *Kistler, supra,* 464 Pa. at 484–85, 347 A.2d at 316; *Davis & Warde, Inc. v. Tripodi,* 420 Pa.Super. 450, 455, 616 A.2d 1384, 1387 (1992); *Ruffing v. 84 Lumber Co.,* 410 Pa.Super. 459, 466, 600 A.2d 545, 548 (1991); *Bilec, supra,* 403 Pa.Super. at 184, 588 A.2d at 542; *Wainwright's Travel Ser-* *vice, Inc. v. Schmolk,* 347 Pa.Super. 199, 204, 500 A.2d 476, 478 (1985); *Pennsylvania Higher Education Assistance Agency v. Layton,* 59 D. & C.2d 270, 273–76 (Dauphin Co. C.P.1972); *W.N.O.W. v. Barry,* 32 D. & C.2d 514 (York Co. C.P.1962); and *Nooter Corp. v. Todd,* 687 S.W.2d 695, 696–97 (Mo.App.1985) (applying Pennsylvania law).

■ In Pennsylvania, as in other jurisdictions, the term "consideration" in the restrictive covenant context implies a corresponding benefit to the employee or a beneficial change in his or her employment status. *John G. Bryant Co. v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 10–11, 369 A.2d 1164, 1168–69 (1977); *Maintenance Specialties, supra,* 455 Pa. at 333, 314 A.2d at 282–83; *Modern Laundry & Dry Cleaning Co. v. Farrer,* 370 Pa.Super. 288, 293, 536 A.2d 409, 411 (1988); and *Quaker City Engine Rebuilders, Inc. v. Toscano,* 369 Pa.Super. 573, 578–79, 535 A.2d 1083, 1086 (1987). *See also Kramer v. Robec, Inc.,* 824 F.Supp. 508, 511 (E.D.Pa.1992); B. MALSBERGER, COVENANTS NOT TO COMPETE—A STATE BY STATE SURVEY 929–30 (2nd ed.1996); and J. Leibman & R. Nathan, *The Enforceability of Post–Employment Noncompetition Agreements Formed After At–Will Employment Has Commenced: The "Afterthought" Agreement,* 60 S.CAL.L.REV. 1465, 1529–30 (1987).

As noted by the courts, examples of "new" consideration include

(1) The acquisition of stock. *See Wainwright's Travel Service, supra,* 347 Pa.Super. at 204, 500 A.2d at 478;

(2) Special training or knowledge acquired during employment. *See Hopper v. All Pet Animal Clinic, Inc.,* 861 P.2d 531, 541 (Wyo.1993); *National Recruiters, Inc. v. Cashman,* 323 N.W.2d 736, 740–41 (Minn.1982); and *Davies & Davies Agency, Inc. v. Davies,* 298 N.W.2d 127, 131 (Minn.1980); and *Ashland Oil, Inc. v. Tucker,* 768 S.W.2d 595, 600 (Mo. App.1989);

(3) Promotions. *See Jacobson, supra,* 427 Pa. at 449, 235 A.2d at 618; and *Records Center, Inc. v. Comprehensive Management, Inc.,* 363 Pa.Super. 79, 85, 525 A.2d 433, 435 (1987); and

(4) Pay raises, employment benefits, or other advantages for the employee. *See Hopper, supra,* 861 P.2d at 541; and *Stevenson v. Parsons,* 96 N.C.App. 93, 96–97, 384 S.E.2d 291, 292–93 (1989), *review denied,* 326 N.C. 366, 389 S.E.2d 819 (1990).

*See generally* 54A AM.JUR.2d, Monopolies, Restraints of Trade, and Unfair Trade Practices, § 897, at 195–96 (1996). *See also* Annot. *Sufficiency of Consideration for Employee's Covenant Not to Compete, Entered into After Inception of Employment,* 51 A.L.R.3d 825, 829–32 (1973).

■ However, no "new" consideration to support a restrictive covenant is shown where (1) the contract recites the salary which the employee is already receiving, (2) a profit-sharing plan offered is available to all employees, or (3) a bonus provided is not guaranteed but is only in such amount as management might determine. *See Environmental Products Co. v. Duncan,* 168 W.Va. 349, 351–52, 285 S.E.2d 889, 890–91 (1981); and *Markson Bros. v. Redick,* 164 Pa.Super. 499, 505–06, 66 A.2d 218, 220–21 (1949). Thus, consideration will only be found when all parties involved gain or lose something in exchange for the promise of the other. T. Harris, *Employer and Employee—Employee Handbooks: Leveling the Playing Field? Brodie v. General Chem. Corp.,* 33 LAND & WATER L.REV. 351, 363 (1998). *See also Burroughs Corp. v. Cimakasky,* 346 F.Supp. 1398, 1399 (E.D.Pa.1972); K. DECKER, 1 COVENANTS NOT TO COMPETE, § 3.3, at 45–46 (2nd ed.1993); and 17A AM.JUR.2d, Contracts, § 515, at 529–30 (1991).

■ In the instant case, we note that the parties' Employment Agreement did not, on its face, alter any benefits, conditions, duties, or responsibilities between them other than adding the restrictive covenants themselves. Thus, the Employment Agreement imposed additional restrictions exclusively on the Debtor. The only consideration recited in this Agreement itself was "employment or continuance in employment," *see* page 317 *supra,* which, although referenced as "part" of the consideration, is not supplemented by any other contractual provision addressing any other "part" of the consideration. This is clearly not sufficient consideration to support an addition of restrictive covenants to an existing employment relationship. *See Kistler, supra,* 464 Pa. at 484–85, 347 A.2d at 316; and the authorities cited in the foregoing paragraph.

As both the Debtor and DellaMonica testified, the manner in which the Employment Agreement was presented to the Debtor reveals that O'Reilly did not therein alter the Debtor's employment status as it had existed over the past eight (8) years in any appreciable way. This testimony consistently established that at no time was there any discussion between the parties concerning the Employment Agreement, nor the Debtor's employment status. The record further shows that the Debtor was simply required to sign the Employment Agreement on the spot, without an opportunity for negotiation or even review on his own. In these circumstances, it was unlikely that the Debtor would have received any "new" consideration for the restrictive covenants imposed by the Employment Agreement.

We understand Walheim to make the following arguments in opposition to the contention that consideration for the restrictive covenants was lacking: (1) *Boyce, supra,* and its progeny suggest that even covenants not supported by consideration are enforceable at law irrespective of their possible unenforceability in equity by an injunction; and (2) DellaMonica's testimony, T2, at 21–22, reiterated herein at page 319 *supra,* supports the notion that the Debtor received a higher rate of commis-

sion as a result of the execution of the Employment Agreement.

██ With respect to any implication by Walheim that consideration may not be required by Walheim to enforce the covenants in issue in an action at law for damages, we disagree. As we stated in *In re Griffin*, 1995 WL 495998, at *2 (Bankr. E.D.Pa. Aug.15, 1995), as to *any* contractual claim,

> [i]t cannot be gainsaid that consideration is necessary to validate a contract. *See Peoples Mortgage Co. v. Federal Nat'l Mortgage Ass'n*, 856 F.Supp. 910, 923–24 (E.D.Pa.1994); *In re III Enterprises Inc. V*, 163 B.R. 453, 462–63 (Bankr. E.D.Pa.), *aff'd sub nom. Pueblo Chemical, Inc. v. III Enterprises Inc. V*, 169 B.R. 551 (E.D.Pa.1994); and *Thomas v. R.J. Reynolds Tobacco Co.*, 350 Pa. 262, 266, 38 A.2d 61, 63 (1944). Furthermore, it is well established that "[a] promise unsupported by consideration is nudum pactum and unenforceable at law. *Stelmack v. Glen Alden Coal Company*, 339 Pa. 410, 14 A.2d 127 (1940)." *In re Packer Ave. Associates*, 1 B.R. 286, 290 (Bankr.E.D.Pa.1979). *See also McClurg's Appeal*, 58 Pa. 51, 54 (1868).

Thus, the restrictive covenants at issue are not enforceable in any way, at law or in equity, if consideration for them was lacking.

With respect to the contention that DellaMonica's testimony can be read to support the principle that the Debtor's compensation rate was increased as a term of the Employment Agreement, we also disagree. It is unclear at what point in time DellaMonica is stating that the general commission rate changed from 37½ percent to 42½ percent. While DellaMonica stated that he "thinks" that the change occurred "after" the Employment Agreement was signed, his words do not expressly state or even imply that it was at that time or "right after" the Agreement was signed that the charge occurred and hence that any cause-and-effect relationship existed. Moreover, the general commission rate set forth in the Employment Agreement was 40 percent, which indicates that, at the time that the Agreement was signed, the commission paid was at an intermediate rate between the 37½ and 42½ figures referenced by DellaMonica. This passage is therefore insufficient to satisfy Walheim's burden of proving consideration by a contemporary increase in the commission rate, especially in light of the Debtor's testimony that no change was effected at the time; the failure of the Agreement, though obviously prepared by O'Reilly and thus being in its control, to recite any actual consideration; and the other testimony of DellaMonica on the subject, which supports the Debtor's testimony in unequivocally stating that no element of bargaining or negotiating occurred in the course of execution of the Employment Agreement, and hence that these provisions constituted an adhesion contract.

██ DellaMonica's testimony on this point therefore is most logically interpreted as stating that O'Reilly's commission rates did *not* change nor increase until a later date after the Agreement was signed, which had no actual relationship to the execution of the Agreement. Pennsylvania courts have consistently held that, in order to be enforceable, restrictive covenants must be executed contemporaneously with the exchange of consideration. *Capital Bakers, supra*, 426 Pa. at 190–91, 231 A.2d at 293–94; and *Records Center, supra*, 363 Pa.Super. at 85, 525 A.2d at 436. Therefore, it is clear that the restrictive covenants at issue lacked the requisite consideration. As a result, Walheim's claim, based on the enforceability of the Employment Agreement, must be disallowed in its entirety because consideration for the Agreement was absent.

Since the lack of consideration for the restrictive covenants bars their enforcement, we need not and therefore will not address the Debtor's alternative arguments in support of unenforceability of the restrictive covenants. We are able to say

that none of these arguments are frivolous, and that Walheim's measure of its damages appears grossly speculative and excessive.

As we noted at page 315 *supra*, we perceive no basis under the Code for compensating Walheim's efforts in "bringing the Debtor to justice." Unfortunately for Walheim, its underlying Claim simply lacks legal merit. In retrospect, perhaps the Debtor should simply have contested Walheim's claims in state court, and skipped his unfortunate venture into bankruptcy. We believe that the same result of striking Walheim's claims in their entirety would have been reached in state court.

### D. CONCLUSION

An order which is consistent with the conclusions which we have reached in this Opinion follows.

## APPENDIX "A"

### MATTHEW P. VERDI—AMENDED LOSS CLAIM BASED ON TESTIMONY

| | | FEES | INTEREST FROM | AS OF 1/31/00 INTEREST AT 6.00% |
|---|---|---|---|---|
| SIDE PRACTICE FEES 1990—SEE NOTE 2 | SCHEDULE 2 | $ 9,290.00 | 12/31/90 | $ 5,067.00 |
| SIDE PRACTICE FEES 1991—SEE NOTE 2 | SCHEDULE 2 | $ 9,330.00 | 12/31/91 | $ 4,529.00 |
| SIDE PRACTICE FEES 1992—SEE NOTE 2 | SCHEDULE 2 | $ 8,830.00 | 12/31/92 | $ 3,755.00 |
| SIDE PRACTICE FEES 1993—SEE NOTE 2 | SCHEDULE 2 | $ 6,040.00 | 12/31/93 | $ 2,206.00 |
| SIDE PRACTICE FEES 1994—SEE NOTE 2 | SCHEDULE 2 | $ 5,040.00 | 12/31/94 | $ 1,539.00 |
| SIDE PRACTICE FEES 1995—SEE NOTE 2 | SCHEDULE 2 | $ 3,940.00 | 12/31/95 | $ 966.00 |
| MISAPPROPRIATED CLIENTS (YEAR 1)—*SEE NOTE 1* | SCHEDULE 1 | $ 27,505.00 | 12/31/92 | $ 11,697.00 |
| OTHER CANCELLED CLIENTS MISAPPROPRIATED | SCHEDULE 3 | | 12/31/92 | $ – |
| MISAPPROPRIATED CLIENTS (YEAR 2)—*SEE NOTE 1* | SCHEDULE 1 | $ 27,505.00 | 12/31/93 | $ 10,046.00 |
| OTHER CANCELLED CLIENTS MISAPPROPRIATED | SCHEDULE 3 | $ – | 12/31/93 | $ – |
| MISAPPROPRIATED CLIENTS (YEAR 2)—*SEE NOTE 1* | SCHEDULE 1 | $ 27,505.00 | 12/31/94 | $ 8,396.00 |
| OTHER CANCELLED CLIENTS MISAPPROPRIATED | SCHEDULE 3 | $ – | 12/31/94 | $ – |
| TOTAL FEES | | $124,985.00 | | $ 48,201.00 |
| INTEREST AT 6% | | $ 48,201.00 | | |
| ATTORNEY'S FEES THROUGH 1/13/2000 (BANKRUPTCY ONLY) | | $ 25,056.13 | | |
| COSTS THROUGH 1/13/2000 (BANKRUPTCY ONLY) | | $ 3,388.57 | | |
| TOTAL LOSS BASED ON TESTIMONY | | $201,630.70 | | |

NOTE 1: MR. VERDI TESTIFIED THAT THE INCOME PRODUCED BY THE CLIENTS THAT WENT WITH HIM AFTER LEAVING THE FIRM WAS ACCURATELY REFLECTED IN SCHEDULE 1 BASED ON THE CLIENTS' ACTUAL RECEIPTS THAT WERE TURNED IN AND SIGNED BY HIM FOR THOSE CLIENTS FOR WHICH HE WAS PAID A COMMISSION.

NOTE 2: EXCLUDED FROM SCHEDULE 2 DAMAGES ARE SMITH AND MICHAEL AND RAE HYMOVITZ, WHOSE ACCOUNTS MR. VERDI TESTIFIED HE DID NOT RECALL SERVICING. ALSO EXCLUDED ARE THE "RETURNS UNKNOWN" DAMAGES CALCULATION.

### ORDER

AND NOW, this 10th day of February, 2000, after a hearing of January 5, 2000, scheduled pursuant to our Order of December 10, 1999, relevant to the Debtor's objections ("the Objections") to the proof of claim ("the Claim") filed by the Walheim Group ("Walheim"), and upon consideration of the parties' respective post-hearing submissions relevant thereto, it is hereby ORDERED AND DECREED as follows:

1. The Objections are SUSTAINED.

2. The Claim is STRICKEN in its entirety.

3. Since we see no evidence that same has been done pursuant to our Order of December 10, 1999, so directing, the Chapter 13 Trustee or the Clerk are once again directed to forthwith dispatch the notice scheduling the meeting of creditors and confirmation hearing and setting the bar date for filing claims in this case.

4. The Debtor shall forthwith file any necessary Amended Chapter 13 Plan as a result of this Opinion and Order.

5. All provisions of the Order of December 10, 1999, not inconsistent with this Order and other orders entered in this case shall remain in full force and effect.