861 A.2d 735

J. Diane STEVENSON

v.

BRANCH BANKING AND TRUST
CORPORATION, t/a BB & T.

No. 0802, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Nov. 17, 2004.

622

Francis J. Collins (Kahn, Smith & Collins on the brief), Baltimore, for appellant.

Timothy F. McCormack (Hope D. Miller on the brief), Baltimore, for appellee.

Argued before ADKINS, KRAUSER, RAYMOND G. THIEME, JR., (Retired, Specially Assigned) JJ.

ADKINS, Judge.

Branch Banking and Trust Company (BB & T), appellee and cross-appellant, fired Senior Vice President J. Diane Stevenson, appellant and cross-appellee, because her leadership of the bank's Maryland Region did not satisfy its post-merger expectations. Stevenson sued BB & T for breach of her written employment contract and for violation of the Maryland Wage Payment and Collection Law (the Wage Payment Act). See Md.Code (1991, 1999 Repl.Vol., 2004 Cum. Supp.), § 3–501 et seq. of the Labor & Employment Article (LE). Both of Stevenson's claims arise from BB & T's contractual obligation to pay "Termination Compensation" equal to Stevenson's "annual cash compensation" before her termination. The jury's special verdict was in Stevenson's favor on both counts, but the court ordered a remittitur, reducing the award to $60,540.00.

Stevenson asks us to reverse the judgment, arguing *inter alia* that it was too small because, in calculating the amount of severance that the bank owed under the terms of her employment contract, the court erroneously prevented the jury from considering earnings from the exercise of bank stock options that generated a significant portion of her compensation pack-

age. BB & T cross-appeals, arguing *inter alia* that the Wage Payment Act does not extend to an employer's failure to pay severance.

On a question of first impression regarding whether the Wage Payment Act affords relief to employees claiming severance pay, we conclude that non-payment of severance pay representing deferred compensation for services performed during the employment may be grounds for relief under the Act. In this instance, however, the Termination Compensation owed to Stevenson was not the type of "wages for work performed before termination" that gives rise to a Wage Payment Act claim. We shall vacate the judgment for that reason, and because the trial court should have let the jury decide whether Stevenson's severance benefit included her stock option earnings and should not have awarded Stevenson four times her unpaid wages.

## FACTS AND LEGAL PROCEEDINGS

BB & T merged with Maryland Federal Bancorp, Inc. in 1998. At the time, Stevenson was a Senior Vice President of branch operations with Maryland Federal. BB & T offered Stevenson a position as Senior Vice President of the Maryland Region, with a three year written employment agreement beginning September 20, 1998.

Section 4 of the proposed agreement contained a non-compete clause. "[I]n consideration of the mutual covenants" in the employment agreement, Stevenson was asked to promise that, "upon termination of [her] employment," she would not "directly or indirectly, either as a principal, agent, employee, employer, stockholder, co-partner or in any other individual or representative capacity whatsoever," compete with BB & T. Specifically, Stevenson could not "engage in a Competitive [banking, financial services, insurance, mortgage, or trust] Business anywhere in the States of Maryland, Virginia, North Carolina, or South Carolina, or the District of Columbia, or any county contiguous to" those jurisdictions. She also would be barred from soliciting BB & T customers and employees.

Just as when she worked for Maryland Federal, Stevenson's compensation was to include bank stock options. These options allowed her to purchase shares of bank common stock at a below-market price, then sell that stock for a profit at a higher market price, at a time she selected.

The employment contract also provided in Section 6 for "Termination Compensation" if either BB & T or Stevenson terminated the contract before its term expired. The contract stated in pertinent part:

6c. Employer may terminate Employee's employment other than for "Just Cause," as described in Subparagraph (b) above, at any time upon written notice to Employee, which termination shall be effective immediately. **In the event Employer terminates Employee pursuant to this Subparagraph (c),(1) Employee will receive the highest amount of the annual cash compensation (including cash bonuses and other cash-based benefits, including for these purposes amounts earned or payable whether or not deferred) received from Maryland Federal or Employer** during any of the three calendar years immediately preceding such termination ("Termination Compensation") in each year until the end of the Term (prorated for any partial year).... In addition, Employee shall continue to participate in the same group hospitalization plan, health care plan, dental care plan, life or other insurance or death benefit plan, ... on the same terms as were in effect prior to Employee's termination, either under Employer's plans or comparable coverage, for all periods Employee receives Termination Compensation....

6e. In the event Employee elects to resign from employment under this Agreement for other than "Good Reason," death or disability following the one-year anniversary of the date of this Agreement, Employee shall be entitled to receive a lump sum amount equal to his annual Termination Compensation times the lesser of (i) the number of years until the end of the term,

with partial years rounded to two decimal places, or (ii) 2.

6f. In receiving any payments pursuant to this Section 6, Employee shall not be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Employee hereunder, and such amounts shall not be reduced or terminated whether or not Employee obtains other employment. (Emphasis added.)

Before executing this agreement, Stevenson had a face-to-face conversation with Robert Halleck, Regional President of BB & T, about whether "other cash-based benefits" meant that her earnings from the exercise of stock options would be included in the calculation of Termination Compensation. In her employment with Maryland Federal, Stevenson's profits from exercising her stock options had been a significant amount of her overall earnings. In 1997, she earned $60,476.80 as a result of buying and selling Maryland Federal stock.

At trial, Stevenson testified that Halleck assured her that "other cash-based benefits" meant the cash she received as a result of exercising her stock options. Stevenson "chose to go with BB & T ... because of [her] conversations with Mr. Halleck[.]" In accepting the position at BB & T, she declined another position, as President of Enterprise Federal Bank.

Stevenson's employment with BB & T ended just over a year after it began. In the 13 months she worked for BB & T, Stevenson earned a significant portion of her income from the exercise of bank stock options. In 1998, she earned $81,380 in base salary plus twice that amount—$162,601.86—by exercising her options on five different occasions. All five were "cashless same day exercises" in which she purchased and sold bank shares in a single trading session. These stock options were reported to the IRS as employment compensation to Stevenson. The bank direct-deposited into Stevenson's bank account the cash proceeds of her stock option earnings, in the same manner her paycheck was deposited.

On October 31, 1999, Halleck met with Stevenson and told her that he was "going to have to let [her] go" because "the powers that be were very disappointed with the Maryland region, and ... they want to bring somebody in from down south, somebody that was BB & T born and bred, and they felt that they would do a better job." At trial, both Stevenson and Halleck testified that BB & T did not give her an opportunity to stay with the bank in another capacity. Although Halleck gave her the option of resigning, Stevenson rejected that offer because she was aware that she would not have health insurance or stock options for the remaining two years of her contract if she resigned, and that her Termination Compensation otherwise would last through the time she was required to comply with the non-compete clause.

In paying the Termination Compensation due under Stevenson's employment contract, however, BB & T took the position that Stevenson voluntarily resigned, rather than that she was terminated. By letter dated November 9, BB & T informed Stevenson that she was entitled to a lump sum payment of $156,250.18 under section 6(e) of the employment agreement. The letter detailed how the bank calculated the proffered payment:

> There are 23 months remaining in the term of your contract as of your termination date. This equates to a multiplier of 1.92. Phil Burrows confirmed that your termination compensation was $81,380.30, which was your 1998 compensation. So, the payment is calculated as $81,380.30 × 1.92 = $156,250.18.

Thus, BB & T's payment formula excluded from Stevenson's benchmark "1998 compensation" the $162,601.86 she earned that year from the exercise of her stock options. The bank did not provide Stevenson with any information regarding health insurance.

In November 2001, Stevenson filed suit against BB & T, claiming (1) the bank underpaid her because it mischaracterized her termination as a resignation; (2) the bank failed to include the money she earned in exercising her stock options

in its calculation of Termination Compensation, resulting in an underpayment of $314,844.63; and (3) the bank also failed to provide health insurance and other benefits.

A year after Stevenson filed suit, BB & T amended its interrogatory answers to acknowledge that it had underpaid Stevenson by $6,444.04. BB & T explained how it calculated the underpayment:

> In determining [Stevenson's] Termination Compensation, [BB & T] inadvertently failed to include certain deferred cash compensation in the amount of $5,967.00, resulting in an underpayment of severance pay in the amount of $11,456.64. **As of [Stevenson's] termination of her employment, [Stevenson] had accrued, but unused vacation with a value of $3,567.90.** The combined amount of the deferred cash compensation plus accrued vacation is $15,024.04. [Stevenson] terminated her employment effective October 31, 1999, and should have ceased receiving wages, contributions to [BB & T's] 401K plan and health care benefits as of that date. Notwithstanding [Stevenson's] termination of her employment as of October 31, 1999, [BB & T] inadvertently paid to [Stevenson] additional salary after that date in the aggregate amount of $7,730.46, made contribution to [BB & T's] 401K plan for the benefit of [Stevenson] in the amount of $463.82, and provided her health care benefits with an aggregate value of at least $386.22. The combined amount of these benefits was $8,580.50. As a result, [Stevenson] has been underpaid severance in the approximate amount of $6,444.04 through the [BB & T]. (Emphasis added.)

Thus, the bank maintained its position that Stevenson's stock option earnings did not constitute "Annual Cash Compensation" for purposes of determining her Termination Compensation. BB & T issued Stevenson a check in the net after-tax amount of $3,729.75. Viewing the payment as "too little, too late," Stevenson proceeded to trial on her breach of contract and Wage Payment Act claims.

On the first day of Stevenson's jury trial, the court ruled that the phrase "and other cash-based benefits" in section 6(c) of Stevenson's employment agreement is ambiguous. The trial court allowed parol evidence solely on the meaning of that term.

At the conclusion of all the evidence, BB & T moved for judgment on any claim arising from the bank's failure to include profits from the exercise of stock options in its calculation of Stevenson's Termination Compensation. The court granted the motion, citing "the nature of what a stock option is and what happens when it's exercised, and the limiting language in termination as being [']received from Maryland Federal or employer[.']"

Stevenson's breach of contract and Wage Payment Act claims went to the jury on the remaining issues, so that the jury did not factor Stevenson's earnings from the exercise of her stock options into its calculation of the Termination Compensation due under her employment agreement.

The jury returned a special verdict in favor of Stevenson, finding that Stevenson did not resign from BB & T, that BB & T breached the employment contract by underpaying her Termination Compensation, and that there was no bona fide dispute justifying the bank's refusal to pay the full amount owed. The jury awarded damages on Stevenson's common law breach of contract claim in the total amount of $81,452.41.[1] On her statutory Wage Payment Act claim, the jury awarded $244,357.13—three times the damage award on the breach of contract claim.

Dismayed that the jury awarded more damages than Stevenson requested, the trial court immediately announced that it intended to order either a remittitur or a new trial.

---

1. The jury determined that "net amount due as a result of the cost of unpaid medical insurance" was $26,680.92 and the "amount due as a miscalculation of deferred compensation for three [and] a half years" was $45,433.17.

I believe this verdict is the result of my fault in not reminding [jurors] that they can't speculate, and both of [counsels' fault] by not laying out a specific figure.... What I intend to do is rule on a remittitur either today or.... Tuesday.... [I]f it's not accepted, we're going to pick a new jury and retry this case and correct all of the mistakes that I made before.

These amounts are not based on the evidence, are clearly the result of guesswork and speculation. They exceed what [Stevenson's counsel] said [he] thought [she] was entitled. What I should have done is put those amounts on the verdict sheet, and put them in as options, as plaintiff alleges, as defendant alleges, or other, and remind them that they can't guess. And it has to be proven by a preponderance of the evidence or they must enter zero. That's what I should have told them.... [W]hen I got that question [from the jury during deliberations] about what amount does each side claim, I should have had them come out and have you all re-argue and put the figures down specifically. That's what I should have done. I never make the same mistake twice.

▮▮▮ The court concluded that Stevenson had proven actual underpayment of only $15,135.00. It proposed a judgment in favor of Stevenson in an amount equal to four times that amount, or $60,540.00.[2] Although she objected to the size

---

**2.** "A trial judge, upon finding a verdict excessive, may order a new trial unless the plaintiff will agree to accept a lesser sum fixed by the court." *Banegura v. Taylor*, 312 Md. 609, 624, 541 A.2d 969 (1988). Ordinarily, a plaintiff's acceptance of a remittitur will bar her appeal. *See Surratt v. Prince George's County*, 320 Md. 439, 458, 578 A.2d 745 (1990). This rule does not apply in all circumstances, however. *See id.* at 459, 578 A.2d 745. "The 'normal' situations in which the rule precluding appeal has been invoked are those that involve an appeal by the plaintiff with none by the defendant." *Id.*

In this instance, appeals by Stevenson and BB & T were anticipated at the time Stevenson accepted the remittitur in lieu of a new trial. At that time, counsel for Stevenson and the trial court explicitly agreed, without objection from counsel for BB & T, that Stevenson's acceptance of the remittitur would not be taken as an acquiescence barring appeal. BB & T does not argue that Stevenson's acceptance of the remittitur bars her appeal, and under these circumstances, we agree

of this reduction, Stevenson decided to accept the reduced damage award in the belief that "the issue on the stock options is still available for an appeal." The court ordered judgment in the remitted amount on May 23, 2003. The clerk entered judgment on June 6, 2003.

At that point, Stevenson's claim for attorney's fees and litigation costs was still unresolved. Stevenson petitioned for $76,074.75 in attorney's fees and $1,693.45 in expenses. The court conducted hearings on the attorney's fees claim on June 23 and June 30.

At the first hearing, the trial court held that a reasonable fee for the services rendered by Stevenson's attorneys should not include the time spent on the unsuccessful stock option claim. At the court's request, Stevenson's counsel eliminated time expended on that issue. Counsel also supplied the court with a copy of the retainer agreement, which provides for

> a legal fee in the amount of One-third of all sums recovered. These fees are contingent on recovery.... I also agree to pay an hourly, non-contingent fee of $110 per hour for all time spent on the case. This will be paid monthly.... The contingency fee shall be reduced by the amount of any hourly fees paid.

By order dated June 30, 2003, the court awarded Stevenson $20,180 in counsel fees and litigation expenses, an amount equal to the one-third contingency fee set out in the fee agreement.

## DISCUSSION

To resolve this appeal and cross-appeal, we consider the following issues, which we have consolidated, rephrased, and reordered for clarity:

---

that it is not barred. *See Banegura,* 312 Md. at 615, 541 A.2d 969 (rule barring appeal after acceptance of remittitur "has been variously characterized as grounded upon notions of estoppel, waiver, acquiescence, acceptance of benefits, or mootness").

I. Did the trial court err in denying BB & T's request for entry of a satisfaction of judgment?

II. Did the trial court err in instructing the jury to treat any unpaid Termination Compensation as unpaid wages that were subject to the prompt payment requirements of the Wage Payment Act?

III. Did the trial court err in removing from the jury's consideration the issue of whether Stevenson's Termination Compensation should have included profits she earned from the exercise of her stock options?

IV. Did the trial court err in awarding four times Stevenson's unpaid wages or in awarding attorney's fees?

## I.

### The Court Did Not Err In Refusing To Enter A Satisfaction Of Judgment

As a threshold matter, we reject BB & T's cross-appeal challenging the denial of its motion for entry of a satisfaction of judgment. BB & T premised that request on its June 10, 2003 proffer of a bank check in the amount of $60,722.45, representing the post-remittitur award plus 10 days post-judgment interest.

A determination of whether judgment has been satisfied is a question of law that we review *de novo*.[3] *See* Md. Rule 2–622; *Underwood–Gary v. Mathews*, 366 Md. 660, 667, 785 A.2d 708 (2001). "A satisfaction of a judgment is an

---

**3.** Md. Rule 2–626 governs satisfaction of money judgments, and provides in pertinent part:

 (a) **Entry Upon Notice.** Upon being paid all amounts due on a money judgment, the judgment creditor shall furnish to the judgment debtor and file with the clerk a written statement that the judgment has been satisfied. Upon the filing of the statement the clerk shall enter the judgment satisfied.

 (b) **Entry Upon Motion.** If the judgment creditor fails to comply with section (a) of this Rule, the judgment debtor may file a motion for an order declaring that the judgment has been satisfied. . . .

acceptance of full compensation for the injury." *Id.* at 663 n. 2, 785 A.2d 708 (quotation marks and citations omitted).

Here, the proffered bank check did not represent "full compensation" for Stevenson's injuries. The check was delivered after the court-ordered remittitur reduced the amount the jury awarded Stevenson. Subsequent correspondence between counsel concerning this check reflects that Stevenson refused to cash it because counsel was concerned that BB & T would claim she had waived her appellate right to challenge the court's stock option ruling and/or her right to recover attorney's fees.

In the May 23 colloquy concerning remittitur, the trial court acknowledged that the reduced award of $60,540.00 did not compensate Stevenson for her attorney's fees, and that Stevenson was entitled to recover at least some of her fees and expenses.[4] After the court ordered judgment in the remitted amount, it held two hearings on Stevenson's claim for attorney's fees and expenses. The court received detailed records in support of Stevenson's claim for fees and costs. On June 24, BB & T filed a motion seeking a declaration that the judgment had been satisfied. On June 30, the trial court ordered payment of an additional $20,180.00 in "reasonable counsel fees." We have not been directed to any evidence that BB & T proffered the $20,180.00 to Stevenson. By order dated August 28, the trial court denied the bank's motion for an entry of satisfaction.

Thus, the check proffered by BB & T on June 10 represented only partial compensation for Stevenson's claimed injuries, in that it did not purport to compensate Stevenson for the attorney's fees and expenses she allegedly incurred in her efforts to obtain full payment of her wages. In these circum-

---

4. The reason for bifurcating the attorney's fee claim from the underlying Wage Payment Act claim was evidently that the decision about whether BB & T violated the prompt payment requirements is for the jury while the decision about whether Stevenson should receive counsel fees, and if so how much, is for the court. *See Admiral Mortgage, Inc. v. Cooper,* 357 Md. 533, 553, 745 A.2d 1026 (2000).

stances, BB & T's payment could not be considered "full compensation," and the trial court did not err in refusing to enter a satisfaction of judgment.

## II.

### The Trial Court Correctly Ruled That Severance Pay May Be Recovered Under Maryland's Wage Payment Act, But Erred In Affording Stevenson A Statutory Remedy For The Bank's Underpayment Of "Termination Compensation"

Maryland's Wage Payment Act protects employees from wrongful withholding of wages by employers upon termination. LE section 3–505, governing payment upon termination of employment, provides:

> **Each employer shall pay an employee … all wages due for work that the employee performed before the termination of employment,** on or before the day on which the employee would have been paid the wages if the employment had not been terminated. (Emphasis added.)

Section 3–507.1 creates a private right of action to recover unpaid wages:

> **[I]f an employer fails to pay an employee in accordance with … § 3–505 of this subtitle,** after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages. … If … a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court **may award the employee an amount not exceeding 3 times the wage,** and reasonable counsel fees and other costs. (Emphasis added.)

■■ "The principal purpose of the Act '[is] to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages.' " *Medex v. McCabe,* 372 Md. 28, 39, 811 A.2d 297 (2002). The focus of the subtitle is not on "the amount of wages payable but rather the duty to pay whatever

wages are due on a regular basis and to pay all that is due following termination of the employment." *Friolo v. Frankel,* 373 Md. 501, 513, 819 A.2d 354 (2003).

In its cross-appeal, BB & T argues that "[c]ontractually established severance due after employment ends falls outside the Wage [Payment] Act" because "the General Assembly has chosen not to include severance payments within the definition of wages." In support, the bank cites two decisions from other state courts holding that severance pay does not constitute "wages." In *Dep't of Labor ex rel. Commons v. Green Giant Co.,* 394 A.2d 753, 755 (Del.Sup.Ct.1978), a Delaware trial court held that severance pay was not "wages" within the meaning of that state's prompt payment law.

> The review of the word usage in the statute indicates that the word "wages" was used to refer to the regular direct compensation which would ordinarily be paid at the end of each period of a certain number of work days.... The usage ... does not adapt itself to the concept that "wages" include nonrecurrent benefits such as severance pay.

*Id.*

In *McGowan v. Administrator, Unemployment Compensation Act,* 153 Conn. 691, 220 A.2d 284, 286 (1966), the Connecticut Supreme Court held that severance pay is not "wages" for purposes of determining whether a terminated employee qualifies for unemployment. The court reasoned that,

> in the connotation of the statute, wages cease when employment does, severance pay cannot be considered wages. Severance pay is "a form of compensation for the termination of the employment relation, for reasons other than the displaced employees' misconduct, primarily to alleviate the consequent need for economic readjustment but also recompense him for certain losses attributable to the dismissal."

*Id.* (citations omitted). Our research also revealed more recent decisions holding that severance pay should not be considered wages for purposes of prompt payment statutes.[5]

---

**5.** *See Prozinski v. Northeast Real Estate Servs., LLC,* 59 Mass.App.Ct. 599, 797 N.E.2d 415, 419–20 (2003)(construing wage act narrowly,

When construing the Wage Payment Act, our goal is to determine the General Assembly's intent so that we can apply the statute in the manner designed by the legislature. *See Whiting–Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 301, 783 A.2d 667 (2001). We begin with the "the words of the statute, which we give their ordinary and common meaning." *Id.* at 302, 783 A.2d 667. "We consider the meaning of the statutory language in the context of the overall statutory scheme. Only if the words of the statute are ambiguous need we seek the Legislature's intent in the legislative history or other extraneous sources." *Id.* (citation omitted).

LE section 3–501(c) defines "wage" broadly and specifically identifies a non-exclusive list of compensation categories as wages for purposes of the Act:

(1)"Wage" means all **compensation that is due to an employee for employment.**

(2) **"Wage" includes:**

 (i) A bonus;

 (ii) A commission;

 (iii) A fringe benefit; or

---

court held that statute did not encompass executive's severance pay because it did not mention severance, severance pay was not earned before termination, and legislature did not intend "to provide treble damages and attorneys fees to professionals enforcing their asserted contract rights"); *Design Indus., Inc. v. Cassano*, 776 N.E.2d 398, 404 (Ind.Ct.App.2002)(one year severance pay in executive employment agreement was not wages because it was "not compensation earned for work performed"); *Drybrough v. Acxiom Corp.*, 172 F.Supp.2d 366, 371 (D.Conn.2001)("Severance pay is not a wage because it is not 'compensation for labor or services rendered,' and because wages, unlike severance pay, cease when employment does")(citing *McGowan* ) (citations omitted); *Bellino v. Schlumberger Tech., Inc.*, 753 F.Supp. 391, 393 (D.Me.1990)(under Maine law, wages do not include severance because, in contrast to vacation pay, legislature did not explicitly state severance pay should be treated as wages and because severance "become[s] due only upon and by reason of an employee's termination"); *Heimbouch v. Victorio Ins. Serv., Inc.*, 220 Neb. 279, 369 N.W.2d 620, 624 (1985)("termination compensation due the plaintiff under the agreement was not compensation for labor or services rendered to the defendant, but was in the nature of a severance payment or liquidated damages which became due upon termination of the agreement").

(iv) **Any other remuneration promised for service.** (Emphasis added.)

■ The Maryland Wage Payment Act does not specifically mention severance pay.[6] Nor has there been any reported Maryland decision concerning whether severance pay constitutes "wages" within the meaning of the Act.

Stevenson contends that severance pay fits within the broad definition of wages under LE subsection 3–501(c)(1). She argues that severance pay is both "compensation for employment" and "other remuneration promised for service." LE § 3–501(c). In support, Stevenson points to the Court of Appeals' rationale for its decisions in *Whiting–Turner v. Fitzpatrick*, 366 Md. 295, 783 A.2d 667 (2001), and *Medex v. McCabe*, 372 Md. 28, 811 A.2d 297 (2002), in which the Court recognized that profit sharing and incentive payments, respectively, may qualify as wages that are subject to the Wage Payment Act.

Stevenson also claims that the out-of-state cases cited by BB & T represent the minority view. According to Stevenson, the decisions holding that severance pay may constitute wages that must be paid in compliance with statutory prompt payment requirements represent the prevailing and better reasoned position.

---

**6.** Some statutes explicitly define "wage" as including or excluding severance pay. *See, e.g.,* Ariz.Rev.Stat. § 23–350(2)("Wages include . . . severance pay"); Colo.Rev.Stat. § 8–4–101(8)(b)(revised after Colorado courts held that severance pay constitutes wages, to provide that " '[w]ages' or 'compensation' does not include severance pay"); Iowa Code § 91A.2(7)(b)("Wages means compensation owed by an employer for . . . severance payments which are due an employee under an agreement under an agreement with the employer or under a policy of the employer"); Ky.Rev.Stat. § 337.010(1)(c)("Wages includes any employment due to an employee by reason of his employment, including . . . severance or dismissal pay"); N.C. Gen.Stat. 95–25.2(16)(" 'wage' includes . . . severance pay"); Okla. Stat. § 165.1(4)(" 'Wages' means compensation . . . for labor or services rendered, including . . . severance or dismissal pay"); Wisc. Stat. Ann. § 109.01(3)("Wages" means "remuneration payable to an employee for personal services," which includes "severance pay").

We begin our analysis of this issue by examining the two Maryland decisions construing LE sections 3–505 and 3–507.1. Although neither *Whiting–Turner* nor *Medex* specifically addresses whether Maryland's Wage Payment Act provides relief to employees seeking to recover severance pay, the interpretation of the Wage Payment Act in those cases necessarily frames our analysis.

In *Whiting–Turner,* the Court of Appeals discussed the meaning of "wage" under LE section 3–501(c). When he was hired, Fitzpatrick agreed to a weekly salary. After two years of employment, depending on the company's profits, he would also receive a profit sharing bonus. At the time he resigned, Fitzpatrick had worked less than two years, but Whiting–Turner nevertheless had drawn up a bonus check for him that represented a profit sharing bonus. Although Whiting–Turner offered Fitzpatrick the check if he stayed with the company instead of leaving to work for its competitor, Fitzpatrick elected to resign. He then sued to collect the bonus pay.

The Court of Appeals held that the bonus was not a "wage" subject to the prompt payment requirements of LE section 3–505 because Fitzpatrick had not earned it by fulfilling the two year employment condition. *See Whiting–Turner,* 366 Md. at 306, 783 A.2d 667. In doing so, the Court considered the meaning of "other remuneration promised for service" under subsection 3–501(c)(2)(iv) and distinguished between a gratuitous bonus and compensation earned according to the terms of an employment contract.

[S]ubsection (c)(2)(iv) . . . . has a meaning that is significant to an understanding of why "bonus," and for that matter, "commission" and "fringe benefit" were included as examples of the kind of "other remuneration" that could constitute "wages." Section 501(c)(2)(iv) serves two functions: it makes clear both that the listed forms of remuneration are simply examples, by the use of the phrase "any other remuneration," and that the "other remuneration" that may be included in . . . wages must have been "promised for service."

> The [employee] would read out of the statute the words "promised for service." But reading the statute as including a bonus for wages only when it has been promised as part of the compensation for employment is logical and makes good common sense. The conditions of employment are determined in advance of the employment. What, if anything beyond the basic salary, the employee will receive is a matter for discussion, consideration and agreement. If a bonus is to be made part of the wage package, it can be negotiated and included in what has been promised. Similarly, whether commissions are to be paid or what fringe benefits attach are matters for agreement in advance of the employment or to become a part of the undertaking during the employment. Once a bonus, commission or fringe benefit has been promised as part of the compensation for service, the employee would be entitled to its enforcement as wages.... [T]his reading gives effect to the plain language of the statute and, we believe, is reflective of the Legislature's intent in enacting it.

*Id.* at 304–05, 783 A.2d 667.

Applying a "bright line test," the Court of Appeals held that the profit sharing bonus Whiting–Turner planned to give Fitzpatrick if he stayed with the company was not a "wage" because his right to receive that bonus had not yet vested. *See id.* at 305–06, 783 A.2d 667. The Court reasoned that, although he had been promised a bonus as compensation for service, Fitzgerald had not earned the bonus before his employment terminated.[7] The bonus therefore did not qualify as a "wage" recoverable under the Wage Payment Act.

---

**7.** The Indiana Court of Appeals reached the same conclusion in a similar situation involving severance pay. In *Wank v. Saint Francis College*, 740 N.E.2d 908 (Ind.Ct.App.2000), a college that was merging with another institution terminated a long time college employee, but offered severance pay. The Indiana court held that the severance pay was a gratuitous bonus for faithful service, rather than wages, because the employee had no right to the payment under the terms of his employment contract, the payment was not connected to work performed by the employee and was not otherwise deferred compensation. *See id.* at 913–14.

In *Medex*, the Court of Appeals applied the same rationale in concluding that an incentive payment qualified as a "wage" under section 3–501(c). McCabe was employed as a sales representative for a medical supplies manufacturer, whose employment terms provided for a salary plus "incentive fees" that were paid out according to "a series of [annual] incentive compensation plans." *See id.* at 33, 811 A.2d 297. The employee manual stated that incentive payments were "conditional upon meeting targets and the participant being an employee at the end of the incentive plan (generally the fiscal year) and being employed at the time of actual payment." *Id.* McCabe resigned four days after an incentive plan ended, but before payments under that plan were due to be made. Medex refused to pay McCabe, citing his failure to satisfy the last condition of "employment at the time of actual payment."

This Court concluded the incentive payments were "commissions" and that McCabe had earned them as wages under section 3–501(c). *See McCabe v. Medex,* 141 Md.App. 558, 564–65, 786 A.2d 57 (2001), *aff'd,* 372 Md. 28, 811 A.2d 297 (2002). We held, *inter alia,* that the third requirement of employment at the time of payment was "invalid in light of Maryland statutory and common law." *Id.*

The Court of Appeals agreed. *See Medex,* 372 Md. at 35–36, 811 A.2d 297. The Court emphasized that "it is the exchange of remuneration for the employee's work that is crucial to the determination that compensation constitutes a wage[.]" *Id.* at 36, 811 A.2d 297. McCabe's work to meet the company's sales targets satisfied that test. "In accordance with the policy underlying the Maryland Act, an employee's right to compensation vests when the employee does everything required to earn the wages." *Id.* at 41, 811 A.2d 297. In McCabe's case, "[t]he right to future commissions formed part of the inducement for his initial and continuing employment." *Id.* at 42, 811 A.2d 297. Because "the incentive fees were related directly to sales made by the employees during a defined fiscal year" and "McCabe had performed all the work necessary to earn the fees," "the fees were compensation for

work performed, and, thus, wages under the Act." *Id.* at 37, 811 A.2d 297.

Applying the lessons of *Whiting–Turner* and *Medex,* we have no trouble rejecting BB & T's argument that Maryland's Wage Payment Act excludes severance pay because it does not mention this particular type of compensation. The trial court correctly concluded that "the listed forms of remuneration are simply examples" of different types of "wages." *Whiting–Turner,* 366 Md. at 304, 783 A.2d 667. Consequently, the legislature's failure to explicitly define severance pay as a "wage" does not necessarily mean that Stevenson's Termination Compensation is not covered by the Act.[8]

---

8. Courts in other jurisdictions have construed analogous wage payment statutes to include severance pay, citing inclusive statutory language, as well as the legislature's preventive and remedial goals of promoting timely payment of all compensation owed to an employee after termination. *See, e.g., Kulinski v. Medtronic Bio–Medicus, Inc.,* 112 F.3d 368, 371 (8th Cir.1997)(termination pay due to national sales manager under change of control agreement was "wages" under Minnesota wage payment statute that is broadly construed to cover " 'all damages arising out of the employment relationship' "); *Tischmann v. ITT/Sheraton Corp.,* 882 F.Supp. 1358, 1370 n. 9 (S.D.N.Y.1995)("Severance pay clearly falls within the broad definition of 'wages' " under New York law); *Eckholt v. Am. Business Info., Inc.,* 873 F.Supp. 507, 509 (D.Kan.1994)(severance pay in corporate president's contract constituted "wages" in light of "broad definition" of wages in Kansas statute "and the statute's broadly protective purpose"); *Triad Data Serv., Inc. v. Jackson,* 153 Cal. App.3d Supp.1, 200 Cal.Rptr. 418, 423 (1984), *overruled in part on other grounds by Smith v. Rae Venter Law Group,* 29 Cal.4th 345, 127 Cal.Rptr.2d 516, 58 P.3d 367 (2002)("severance pay constitute[s] wages" given "the present day concept of employer-employee relations" as including "not only the periodic monetary earnings of the employee but also the other benefits to which he is entitled as part of his compensation"). *See also Chisholm v. Ultima Nashua Indus. Corp.,* 150 N.H. 141, 834 A.2d 221, 226–27 (2003)(affirming jury verdict under wage payment statute based on failure to pay severance benefit); *Metro. Distributors, Inc. v. Ill. Dep't of Labor,* 114 Ill.App.3d 1090, 70 Ill.Dec. 653, 449 N.E.2d 1000, 1003–04 (1983)(adopting "approach taken by majority of other jurisdictions" in holding that "severance pay as provided for in [collective bargaining] agreement constitutes ... wages"); *Chvatal v. U.S. Nat'l Bank,* 285 Or. 11, 589 P.2d 726, 728 (1979)(recognizing that "unpaid vacation and severance benefits can be 'wages' under" wage payment statute). Courts have held severance to be "wages" in other contexts as well. *See, e.g., Meehan v. Comm'r of Internal Revenue,* 122 T.C. No. 23, 122 T.C. 396, Tax Ct. Rep. (CCH)

We turn next to BB & T's alternative argument that severance pay falls outside the scope of the Act because it does not compensate employees for work performed before termination. BB & T points out that, by legislative directive, the prompt payment protections of LE section 3–505 extend only to terminated employees who have not been paid "wages due for work performed before termination," and that the statutory remedy in section 3–507.1 is available only when there is a violation of section 3–505. In our view, however, BB & T's theory that this excludes severance pay rests on the incorrect factual premise that severance pay can never be remuneration for an employee's services.

Many courts have recognized that severance pay often represents a type of deferred compensation for work performed during the employment. *See, e.g., Fang v. Showa Entetsu Co.*, 91 P.3d 419, 422 (Colo.Ct.App.2003), *cert. denied*, 2004 WL 1301893 (Colo. June 14, 2004)("In the absence of controlling statutory provisions, severance payments are generally viewed as consideration for past services" so that contractual severance provision, which was "determinable and vested upon entering the contract, payable under the contract upon termination," constituted "wages"); *Ferry v. XRG Internat'l, Inc.*, 492 So.2d 1101, 1103–04 (Fla.Ct.App.1986)(severance was "wages" because "one year's salary provided for in the contract should the [employee] be terminated without cause was an inducement to procure his services and to help ensure the continued quality of those services once he was employed"); *Triad Data Serv., Inc. v. Jackson*, 153 Cal. App.3d Supp. 1, 200 Cal.Rptr. 418, 423 (1984)("severance pay constitute[s] wages" given "the present day concept of employer-employee relations" as including "not only the periodic monetary earnings of the employee but also the other benefits to which he is entitled as part of his compensation"); *Heimenz v. Pa. Power & Light Co.*, 23 Wage & Hour Cas. (BNA) 227

---

55662, Tax Ct. Rep. Dec. (RIA) 122.23 (U.S.Tax Ct.2004)(taxpayer's severance pay was "wages" within meaning of regulations permitting levy upon wages and providing that taxpayer is not entitled to Collection Due Process hearing with respect to certain wage levy actions).

(Pa. Ct. Common Pleas 1976)(severance pay under company plan was "wages" because calculation formula based on years of service showed pay "is clearly intended to be a form of compensation for labor or services rendered over time"). Our Court of Appeals long ago subscribed to that view in *Dahl v. Brunswick Corp.*, 277 Md. 471, 480, 356 A.2d 221 (1976)(approving the "generally accepted" view of severance pay as "a reward for past services," rather than "a form of unemployment insurance").

These courts view severance pay as compensation that is "earned" before termination and payable at the time employment ends. The oft-cited explanation was offered in a New Jersey case involving the arbitrability of a dispute over vacation benefits in a collective bargaining agreement. In deciding that issue, the court examined the nature of both vacation pay and severance pay:

> Vacation pay, as well as **severance pay, has often been said to be in the nature of deferred compensation, in lieu of wages, earned in part each week the employee works, and payable at some later time.** In the case of vacation pay, the future date is usually fixed; with severance pay it is dependent on termination of employment. In this sense such benefits "accrue" during the work year, not merely on the date when they become payable.

*Botany Mills, Inc. v. Textile Workers Union of Am.*, 50 N.J.Super. 18, 141 A.2d 107, 113 (1958)(emphasis added). *See also Owens v. Press Publ'g Co.*, 20 N.J. 537, 120 A.2d 442, 446 (1956)("In a real sense, [severance pay] is remuneration for services rendered during the period covered by the agreement").

Given the broad language of the statute and its remedial purpose, we conclude that the scope of Maryland's Wage Payment Act extends to the type of severance pay that represents deferred compensation for work performed during the employment. Thus, a severance benefit that is based on the length and/or nature of the employee's service, and promised upon termination, may be recoverable under the Wage Payment Act.

 The problem for Stevenson, though, is that her Termination Compensation does not fit this description. After examining Stevenson's employment agreement, we conclude that the Wage Payment Act does not provide her a remedy for BB & T's underpayment of Termination Compensation. We explain.

Unlike severance pay that is tied to length of employment, Stevenson's contractual severance benefit compensates her for the nearly two years remaining in her three year employment term. The terms of the employment contract make it clear that Stevenson's Termination Compensation is payment for her agreement not to compete following termination. Stevenson's right to receive Termination Compensation is explicitly tied to her duty not to compete with the bank after the end of her employment:

[Section 4(d)]: If Employee's employment is terminated by Employer for reasons other than Just Cause ... at any time, Employee will be subject to the [non-compete] provisions of Section 4(a) until the later of: (i) the first anniversary of Employee's termination or (ii) the date as of which Employee ceases to receive Termination Compensation as provided in Section 6(c). . . .

[Section 6(c)]: . . . . Notwithstanding anything in this Agreement to the contrary, **if Employee breaches [the non-compete provisions in] section 4(a) of this Agreement during the period that [s]he is receiving Termination Compensation, Employee will not be entitled to receive any further Termination Compensation[.]** (Emphasis added.)

The cross-referenced provisions in Stevenson's employment agreement establish that, even if Stevenson's Termination Compensation fits the definition of a "wage," in that it was "remuneration promised for [Stevenson's] services" in refraining from competing with the bank,[9] that wage was not "due for

---

9. We are aware that, in *Raffaelli v. Advo, Inc.*, 218 F.Supp.2d 1022, 1026 (D.Wis.2002), a Wisconsin federal court held that an executive

work that [Stevenson] performed before the termination of [her] employment[.]" *See* LE § 3–501(c), § 3–505. The Termination Compensation was promised to Stevenson in exchange for the 23 months she agreed to refrain from competing with the bank, not for the 13 months she actually worked at BB & T. Given that the payment was explicitly a *quid pro quo* for this non-compete, Stevenson could not possibly "perform all the work necessary to earn" the Termination Compensation until after her 13 month employment ended. *Cf. Medex*, 372 Md. at 36–37, 811 A.2d 297.

In summary, Stevenson does not have a Wage Payment Act claim with respect to the bank's underpayment of Termination Compensation because (1) LE section 3–507.1 may be invoked only when the employer "fails to pay an employee in accordance with section 3–505," (2) LE section 3–505 applies only to employers who do not promptly pay all "wages due for work that the employee performed before the termination of employment[,]" and (3) Stevenson's Termination Compensation was not payment "for work [she] performed before the termination of employment."

■ A contrary conclusion would require us to ignore the limiting phrase "due for work performed before termination" in section 3–505. We may not do so. *See Whiting–Turner*, 366 Md. at 304, 783 A.2d 667. As the Court of Appeals emphasized in *Whiting–Turner* and *Medex*, "an employee's right to compensation vests [only] when the employee does everything required to earn the wages" and the Wage Payment Act affords relief only when the employee "ha[s] performed all the work necessary to earn the [compensation]"

---

employment contract with a severance benefit tied to a non-compete agreement qualified as "wages." Although that court concluded the executive had a wage payment act claim, we find it significant that Wisconsin's statute does not feature the same language limiting which wages must be paid within the statutory time period that we see in LE section 3–505. *Compare* Wis. Stat. § 109.03(2)(discharged employees "must be paid in full" within prescribed time period) *with* LE § 3–505 (discharged employee must be paid "all wages due for work performed before the termination of employment" within prescribed time period).

before termination. *See Medex*, 372 Md. at 37, 41, 811 A.2d 297; *Whiting–Turner*, 366 Md. at 304–05, 783 A.2d 667.

We therefore find merit in BB & T's cross-appeal challenging the Wage Payment Act judgment. We must vacate that judgment and remand for further proceedings, as we shall discuss in greater detail following our consideration next of the primary issue raised by Stevenson's appeal. *See infra* Section III.C.

## III.

### The Trial Court Erred In Ruling As A Matter Of Law That Earnings From The Exercise Of Stock Options Were Excluded From Termination Compensation

In her appeal, Stevenson challenges the trial court's decision to remove from the jury the issue of whether her stock option profits should have been used in calculating her Termination Compensation. The Termination Compensation that BB & T voluntarily paid Stevenson reflected Stevenson's 1998 salary income, but excluded the $162,601.86 in gross earnings from her exercise of stock options during that period. Stevenson argues the bank's failure to use these stock option profits to calculate her Termination Compensation resulted in a significant underpayment, in breach of her employment contract.

Section 6c of Stevenson's employment agreement defines "Termination Compensation" as

the highest amount of the **annual cash compensation (including cash bonuses and other cash-based benefits, including for these purposes amounts earned or payable whether or not deferred) received from Maryland Federal or Employer** during any of the three calendar years immediately preceding such termination[.] (Emphasis added.)

In Stephenson's view, "other cash based benefits" includes her stock option earnings because (1) the meaning of Termination Compensation under the contract is ambiguous and (2)

Halleck explicitly told her that her stock option profits would be treated as "cash based benefits," while she was in the process of deciding between BB & T's offer and the presidency of another bank. In BB & T's view, any discussion between Halleck and Stevenson regarding the meaning of "other cash based benefits" is immaterial because such earnings are neither "cash based," nor "annual cash compensation," nor "received from Maryland Federal or [BB & T]."

## A.

## The Trial Court's Rulings

The trial court initially ruled that the Termination Compensation provision is ambiguous due to the disputed meaning of "other cash based benefits." On the first day of trial, while considering pre-trial motions, the court pointed out the uncertain meaning of this phrase:

> The Court: It amazes me.... I have had several major cases with banking institutions, ... and the documents were written, in my opinion, as if they were written by a second year law student.... [T]hat could have [been] explained with another couple sentences what the parties meant, but it did not.
>
> Now, ... there are ambiguities in the direct language. **For example, ... [o]ther cash based benefits. Now, that's as clear as mud. Other cash based benefits.** (Emphasis added.)

Rejecting the bank's argument that "other cash based benefits" clearly excludes earnings from the exercise of stock options, the court acknowledged that the phrase "other cash based benefits" is "qualified by[,] as is the entire annual cash compensation[,]" the phrase "paid by the employer or Maryland Federal." Notwithstanding the latter term, the court

> found that portion is ambiguous.... [A] reasonable person similarly situated at the time could read and other cash based benefits in a number of ways, received from the employer.

Because of this ambiguity, the trial court allowed Stevenson to testify about pre-contractual discussions concerning the meaning of "other cash based benefits." On direct, Stevenson related that she "asked Mr. Halleck what did cash based benefits mean."

[H]e assured me that, the cash I received from my stock options was on my W–2's, and .... that's what cash based benefits were....

I was concerned with this particular question.... I was giving up a pretty good package [with a competitor bank] if I accepted the position. So, I wanted to make sure that it would be advantageous for me to stay with BB & T, to sign the contract with BB & T.... I wanted to verify with him what other cash based benefits included.... He assured me that cash based benefits was the cash I received from my stock options.

Halleck disputed Stevenson's testimony. He testified that he never discussed the meaning of "other cash based benefits" with Stevenson, and denied telling her that stock option earnings would qualify as income for purposes of her severance package.

After hearing that testimony, as well as testimony about the mechanics and reporting practices involved in the exercise of Stevenson's stock options, the court reversed its earlier holding that the Termination Compensation provision was ambiguous. The court reasoned that any ambiguity in the phrase "other cash-based benefits" was eliminated by the ensuing phrase "... received from Maryland Federal or employer." The court explained why it believed Stevenson's Termination Compensation could not include her stock option profits:

I've got ... problems with including the monies earned from the stock option plan as termination comp.... [R]eading it in a light most favorable to [Stevenson], and mindful that the [bank] drafted this agreement, it's inescapable that the words ["]received from Maryland Federal or employer["] ... do not fit a situation where a stock option is exercised.... It's the right to purchase company stock at a

fixed period of time. That's all a stock option is. That may or may not be exercised. However, the moment it is exercised, that gives the right in exchange for the amount involved, the employee to purchase company stock at that price for however brief a period of time.... The stock is then sold on the market, and at whatever price it's sold at, and that's an ascertainable figure based on the Stock Exchange. The employee is given the difference between that amount and the option price. That money is coming for the sale of that stock. That is not coming from the employer.

The court acknowledged that BB & T had made this argument earlier, but explained that it did not rely on the "received from employer" phrase at that time because, "until I heard all of the evidence I couldn't make an intelligent decision with regard to where that money for the stock option came from."

Stevenson argues that the trial court erred in holding that the Termination Compensation provision was not ambiguous, and in deciding as a matter of law that her stock option earnings did not qualify as Termination Compensation. For the reasons set forth below, we agree.

### B.

### Ambiguity

In reviewing a trial court's grant of a motion for judgment in a jury trial, we conduct the same analysis as the trial court, viewing the evidence in the light most favorable to the non-moving party. *See Hurt v. Chavis*, 128 Md.App. 626, 639, 739 A.2d 924 (1999). The interpretation of a written contract is ordinarily a question of law for the court. *See Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504 (2003); *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 250, 768 A.2d 620 (2001). Among the decisions we review *de novo* is whether contractual language is ambiguous. *See Calomiris v. Woods*, 353 Md. 425, 434–35, 727 A.2d 358 (1999).

In determining whether a writing is ambiguous, Maryland has long adhered to the law of the objective interpretation of contracts. Under the objective view, a written contract is

ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning. The determination of whether language is susceptible of more than one meaning includes a consideration of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution[.]"

*Id.* (citations omitted).

If contract language is ambiguous, "the meaning of the contract is a question to be determined by the trier of fact." *Univ. of Baltimore v. Iz,* 123 Md.App. 135, 162, 716 A.2d 1107, *cert. denied,* 351 Md. 663, 719 A.2d 1262 (1998); *see First Union Nat'l Bank v. Steele Software Sys. Corp.,* 154 Md.App. 97, 171, 838 A.2d 404 (2003), *cert. denied,* 380 Md. 619, 846 A.2d 402 (2004). Parol or extrinsic evidence may be admitted to help interpret the ambiguous contract term. *See Beale v. Am. Nat'l Lawyers Ins. Reciprocal,* 379 Md. 643, 660, 843 A.2d 78 (2004); *Calomiris,* 353 Md. at 441, 727 A.2d 358. Even then, however, the parties "will not be allowed to place their own interpretation on what it means or was intended to mean[.]" *Fultz v. Shaffer,* 111 Md.App. 278, 299, 681 A.2d 568 (1996). Instead, the trier of fact must determine "what a reasonable person in the position of the parties would have thought it meant." *Id.*

In evaluating whether the trial court's grant of BB & T's motion for judgment was proper, we must view the evidence and inferences arising therefrom in the light most favorable to Stevenson, as the party opposing judgment. *See* Md. Rule 2-519(b); *Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 363, 517 A.2d 1122 (1986). When presented with the employment contract, Stevenson immediately asked questions about the "Termination Compensation" generally and about the undefined phrase "other cash based benefits" specifically. Even Halleck, the bank's representative during contract negotiations, admitted on cross-examination that he did not have any understanding of what "other cash based benefits" meant. We conclude that a reasonable person could share the uncertainty expressed by Stevenson and Halleck as to whether stock option profits qualified as the type of "other cash based

benefits" that would be factored into Stevenson's Termination Compensation.

We therefore concur with the trial court's initial ruling that the meaning of "other cash based benefits" is ambiguous. Unlike the trial court, however, we do not find that ambiguity resolved by the ensuing phrase "received from Maryland Federal or Employer." Following the objective law of contracts, we must view the disputed term in context with all of the language in the Termination Compensation provision. *See Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 301, 844 A.2d 460 (2004). By focusing exclusively on the "received from" language, the trial court disregarded other descriptive language within the same provision that makes "other cash based benefits" susceptible of the broader interpretation that Stevenson gave it when she signed the employment agreement.

We conclude that profits from the exercise of stock options might reasonably be viewed as falling within the meaning of "cash based benefit," because that term is defined broadly in Stevenson's employment contract to "includ[e] amounts earned ... whether or not deferred." We do not dispute BB & T's contention that the stock options themselves were non-cash compensation that Stevenson "received from Maryland Federal or [BB & T]." *See, e.g., Schneider v. Hagerstown Brewing Co.*, 136 Md. 151, 152, 110 A. 218 (1920)(recognizing that stock option was not cash compensation). But that does not necessarily prevent Stevenson's stock option **profits** from being reasonably viewed as a "cash based benefit" that generated "amounts earned" on a "deferred" basis.

The stock option program was designed to allow an executive bank employee to earn profits through a standardized cashless transaction that could be deferred until a time of the employee's own choosing. Exercise of the option reliably yielded cash given the nature of the single day transaction in which Stevenson could purchase stock at a discounted price set by the bank, then sell at market price for a profit. The "cash" earnings were deposited into Stevenson's account in the

same manner as her "cash" salary paycheck, and reported to the IRS in a comparable manner.

We think a reasonable person in Stevenson's circumstances might view the stock options and their easily traceable cash proceeds as a "cash based benefit" that was "received from Maryland Federal or [BB & T]" in the sense that the stock options were a form of compensation that generated cash through "amounts earned" in the market, "whether or not [those earnings were] deferred." Reading the term to include stock option profits is also reasonable in that the result would be consistent with the bank's obligation, under section 6 of the employment agreement, to pay Stevenson at her "highest" rate of compensation if it terminated her without cause, and to otherwise extend the full range of employee programs and benefits to her during the remainder of the three year contract period. A reasonable person in Stevenson's position could conclude that, if the bank terminated her without cause, she would be paid for the remainder of her three year contract term at a rate that compensated her not only for the loss of her salary and medical benefits, but also for the loss of her opportunities to earn cash through the exercise of stock options.

For these reasons, we reject BB & T's contentions that stock option profits cannot be "annual cash compensation" because they are neither "annual" nor "cash compensation." BB & T again fails to view those terms in the context created by the language defining "annual cash compensation" as "other cash based benefits ... including amounts earned ... whether or not deferred[.]"

Given the lack of any contract definition or clear trade meaning, the trial court erred in ruling that the Termination Compensation provision is unambiguous. We have no quarrel with the trial court's observation that a reasonable person might conclude that stock options are not covered by the provision, as BB & T did after Stevenson was terminated. Where we part company with the trial court is in its selection,

as a matter of law, of the narrower interpretation of "other cash based benefits" over the broader one.

We hold that Stevenson offered sufficient parol evidence to get to the jury on the question of whether her Termination Compensation included stock option profits. Stevenson and BB & T agreed that stock options were given and treated as compensation to executive employees. By itself, Stevenson's testimony that Halleck assured her that stock option profits would be counted toward Termination Compensation was enough to get her to the jury.

There was also circumstantial evidence to bolster this testimony. In the year before she accepted BB & T's offer, Stevenson earned 44% of her 1997 income from the exercise of stock options; in 1998, Stevenson exercised stock options five times before she signed the employment agreement and raised the percentage of her income attributable to stock option profits to 67%. These earnings were reported as income by both the bank and Stevenson.[10]

In these circumstances, a reasonable jury might conclude that the parties intended "other cash based benefits" to encompass the stock option profits that had become such a significant component of Stevenson's compensation package.[11]

---

10. BB & T argues that the fact that Stevenson's stock option profits appeared on her Form W–2 "is irrelevant to the interpretation of the employment agreement." We disagree. Clearly, the tax treatment of these earnings does not definitively establish that they constituted "annual cash compensation ... received from Maryland Federal or [BB & T]." But the W–2 statement is relevant to the interpretation of "annual cash compensation" because it shows that the bank and Stevenson both understood such earnings to comprise part of the compensation that must be annually reported to the IRS. The evidence, therefore, sheds light on the parties' understanding of the Termination Compensation provision.

11. We are not persuaded otherwise by *Gallagher v. Fidelcor, Inc.*, 441 Pa.Super. 223, 657 A.2d 31 (1995), *appeal denied*, 544 Pa. 675, 678 A.2d 365 (1996), which BB & T cites for the proposition that profits from the sale of stock, by definition, cannot constitute "annual compensation." In that case, a Pennsylvania trial court held that the term "annual compensation" in the retirement benefits provision of an employment agreement did not encompass income from the exercise of stock op-

We hold the trial court should have let the jury decide between the two plausible constructions of "other cash based benefits." It was the fact-finders' task to assess the credibility of Stevenson and Halleck with respect to the alleged conversation about whether stock option profits would qualify as "other cash based benefits," and then to decide whether the parties intended "other cash based benefits" to include Stevenson's stock option earnings. *See, e.g., Heat & Power Corp. v. Air Prods. & Chemicals, Inc.*, 320 Md. 584, 597, 578 A.2d 1202 (1990)(ambiguity in contract required that "factual findings about the intention of the parties will have to be made by the trier of fact").

The trial court erred in refusing to let the jury decide whether BB & T owed Stevenson additional Termination Compensation. That error provides additional reason to vacate the judgment, including the breach of contract award. We consider next the scope and consequences of our conclusions in Parts II and III with respect to the Termination Compensation.

## C.

### Conclusion

We shall vacate the judgments on both of Stevenson's claims.

Judgment on the breach of contract claim must be vacated because Stevenson is entitled to have the jury decide whether her income from the exercise of bank stock options constituted "other cash based benefits" that BB & T should have factored into its calculation of Termination Compensation.[12] On re-

---

tions. *See id.* at 33. The contract language stated that the executive employee would be paid a retirement benefit based on a percentage of his "average Annual Compensation (including salary, bonuses and incentive compensation)[.]" *Id.* at 32. We do not find this contract language to be sufficiently similar, nor do we find the rationale for the decision persuasive.

**12.** We note that the trial court denied counsel's request to present to the jury the question of whether stock option profits qualified as "other cash based benefits."

mand, the jury should determine Stevenson's damages depending on its answer to that question and in accordance with the Termination Compensation provision.

Because her claim for unpaid Termination Compensation is not a Wage Payment Act claim, however, Stevenson cannot recover additional statutory damages, over and above her breach of contract damages. Nor can she recover attorney's fees that she incurred in connection with this claim, because the employment agreement does not have an attorney's fee provision and the fee provision in the Wage Payment Act does not apply to Stevenson's claim for additional Termination Compensation.

We must also vacate the judgment on Stevenson's Wage Payment Act claim, because it was tainted by the court's instruction to treat the bank's underpayment of Termination Compensation as grounds for relief under the Act. We assume the jury followed that instruction, so that the judgment as well as the damage award reflect this improper consideration.

We have no way to discern whether the jury would have found a violation of the Act if it had considered only the bank's failure to timely pay "eligible" wages under the Act, such as vacation pay or any deferred compensation that accrued based on work that Stevenson performed before termination.[13] Sim-

---

**13.** Although we have ruled that Stevenson cannot recover unpaid Termination Compensation under the Wage Payment Act, we recognize that the Act does provide her a remedy to recover other unpaid wages that she earned before she was fired, such as any vacation pay or deferred compensation accumulated during her employment.

During this litigation, BB & T admitted that it did not pay Stevenson all of her accumulated vacation pay. It is unclear whether Stevenson contends that she was entitled to more. Moreover, we are uncertain whether, notwithstanding the bank's payment, she is seeking the additional statutory damages available under the Act based on the bank's failure to pay Stevenson within the time period prescribed by LE section 3–505. Even assuming the bank paid Stevenson in full for all her accrued vacation before trial, Stevenson nevertheless was entitled to pursue her claim that BB & T violated the Wage Payment Act by not timely paying such wages, that its failure to pay was not the result of a bona fide dispute, and that Stevenson should be awarded additional

ilarly, we cannot determine how much the jury would have awarded if it found that the bank violated the Act by failing to timely pay Stevenson all of her eligible wages. On remand, Stevenson's opportunity to recover statutory damages and attorney's fees under LE section 3–507.1 is limited by the narrowing of her Wage Payment Act claim in accordance with our decision.

As for the special interrogatory findings made by the jury, we see no reason to revisit the unchallenged factual determination that Stevenson did not resign, but was fired. We cannot afford the same preclusive effect, however, to the jury's findings with respect to Stevenson's damages. This record does not disclose how much, if any, of the damages awarded to Stevenson represent compensation for "eligible wages" that can be recovered under the Wage Payment Act (such as vacation pay and deferred compensation accrued for work performed before termination), or how much of the award represents underpayment of "ineligible" wages that should not have been treated as recoverable under the Act (*i.e.,* Termination Compensation).

For similar reasons, we cannot credit the jury's "no bona fide reason for withholding" finding. Although this finding may be appropriately premised on a finding that the bank had no bona fide reason for not paying Stevenson eligible wages (*i.e.,* accrued vacation and any deferred compensation) until after litigation began, it was not limited in this manner. The jury's determination clearly represented a finding that the

---

statutory damages as well as attorney's fees and expenses incurred to recover such wages.

Moreover, it is unclear whether BB & T also admitted that Stevenson earned deferred compensation before termination, or whether Stevenson claims that she did. It is also unclear whether any of the lump sum payment the bank made to Stevenson before trial represented payment for deferred compensation earned before termination. The same principles applicable to unpaid vacation benefits that qualify as "wages" under the Act would apply equally to any unpaid deferred compensation that qualifies as "wages."

We leave the resolution of these factual issues for the remand proceedings.

bank had no bona fide reason for failing to pay Stevenson's "ineligible wages"—*i.e.*, the full amount of Termination Compensation. The jury's consideration of ineligible wages taints the entire damage award, for the reasons we have explained above.

To guide the parties and the court on remand, we shall briefly address the remaining questions regarding how the trial court interpreted and applied the statutory damages and attorney's fees provisions of LE section 3–507.1.

## IV.

### Damages And Attorney's Fees

Collectively, Stevenson's appeal and BB & T's cross-appeal raise the following issues, which we have rephrased to focus on the questions as they may recur on remand:

A. In awarding treble damages under the Wage Payment Act, can a trial court order the employer to pay the unpaid wages plus three times that amount, resulting in a total award of four times the unpaid wages?

B. Was Stevenson the prevailing party at trial?

C. Is Stevenson entitled to recover attorney's fees arising from her stock option earnings claim?

D. In awarding reasonable attorney's fees, what consideration can a trial court give to the actual amount of unpaid wages and to Stevenson's contingency fee agreement?

We address each question in turn.

### A.

### The Trial Court May Award No More Than Three Times The Wages Withheld Without Bona Dispute

Under Maryland's Wage Payment Act, employees who successfully sue to recover unpaid wages also may be awarded additional damages. LE subsection 3–507.1(b), captioned "[a]ward and costs," permits "the court [to] award the employ-

ee *an amount not exceeding 3 times the wage,* and reasonable counsel fees and other costs." LE § 3–507.1(b)(emphasis added). BB & T argues that the trial court erroneously interpreted this provision as authorization to award four times the amount of Stevenson's eligible unpaid wages. The bank reads section 3–507.1(b) as limiting the maximum award to three times any wrongfully withheld eligible wage.

To our knowledge, neither the Court of Appeals nor this Court has approved a Wage Payment Act damage award equal to four times the unpaid wage. On the other hand, there is no reported Maryland decision specifically holding that the treble damages provision of LE section 3–507.1(b) caps an employee's award at three times the unpaid wage. We shall explicitly adopt the latter construction based on a plain language interpretation of the statute.

The language creating the remedy and the penalty is simple: if there is no bona fide dispute justifying the employer's withholding of the wage, the employee's total compensatory plus punitive award may "not exceed[] 3 times the wage" plus reasonable attorney's fees and costs. *See* LE § 3–507.1(b). That construction is consistent with the Court of Appeals' observation that section 3–507.1(b) authorizes a court to award "*up to* treble damages." *Friolo v. Frankel,* 373 Md. 501, 517, 819 A.2d 354 (2003)(emphasis in original); *see also Battaglia v. Clinical Perfusionists, Inc.,* 338 Md. 352, 353–54, 658 A.2d 680 (1995)("The Act provides, *inter alia,* for a private right of action for certain violations, in which up to three times the compensatory recovery may be awarded, together with counsel fees").

Stevenson's reliance on language in the Court of Appeals' opinions in *Admiral Mortgage, Inc. v. Cooper,* 357 Md. 533, 745 A.2d 1026 (2000), and *Baltimore Harbor Charters, Ltd. v. Ayd,* 365 Md. 366, 780 A.2d 303 (2001), for the proposition that the statute permits an award of both unpaid wages plus treble damages, is misplaced. In neither of those cases did the

Court address the question of whether the statute authorizes treble damages **in addition to** the unpaid wage.[14]

Nor are we persuaded by Stevenson's analogy to the treble damages provision in federal trademark infringement law. *See* 15 U.S.C. § 1117(a). The cited provision contains different language authorizing a federal court to increase the compensatory damage award by **also** awarding, in addition to those damages, "any sum **above the amount found as actual damages, not exceeding three times such amount.**" *See id.* (emphasis added); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191–92 (6th Cir.1997)(because statute vests district court with discretion "to increase a damages award up to three times the actual damages sustained," award of four times actual damages was not error).

Rather, we find a more instructive analogy in Maryland law governing actions to recover another type of wrongfully withheld funds. In *Rohrbaugh v. Estate of Stern*, 305 Md. 443, 505 A.2d 113 (1986), the Court interpreted Md.Code (1974, 2003 Repl.Vol.), § 8–203(h)(3)(ii) of the Real Property Article, which creates a private right of action allowing a tenant to recover unreturned security deposits by bringing an "action [for] up to threefold of the withheld amount, plus reasonable attorney's fees." After Mrs. Stern died, landlord Rohrbaugh withheld her entire $675 security deposit. The trial court held that

---

**14.** In both opinions, the Court mentioned the treble damages provision merely to emphasize that the employee is entitled to recover all of his unpaid wages even when there was a bona fide dispute over them. In *Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 541, 745 A.2d 1026 (2000), the Court observed that "[t]he question of whether [the employer's] withholding of the [wages] was the result of a bona fide dispute has relevance only as to [the employee's] entitlement, under § 3–507.1(b), to **additional (up to treble)** damages[.]" (Emphasis added.) We read that statement as a recognition that the employee is entitled to recover additional damages in these circumstances, in an amount that brings the entire recovery "up to" three times the unpaid wages. We read in a similar manner the Court's statement in *Baltimore Harbor Charters* that a bona fide dispute finding "ends any inquiry as to whether the employee would be entitled to receive **additional damages** according to the provisions of § 3–507.1." *Baltimore Harbor Charters, Ltd. v. Ayd*, 365 Md. 366, 396–97, 780 A.2d 303 (2001)(emphasis added).

$67.50 of the deposit had been improperly withheld, but awarded Stern's estate $2,025, representing damages based on "the entire amount withheld by Rohrbaugh ($675 × 3 = $2,025)." *Id.* at 446, 505 A.2d 113.

The Court of Appeals vacated that award. It explained that section 8–203(h)(3)(ii) is a punitive damages remedy that may be invoked when these funds are withheld without a reasonable basis. Resolving an ambiguity "introduced into this statutory provision during its recodification," the Court held that the trial court was statutorily authorized to treble only the $67.50 that had been improperly withheld. *See id.* at 451, 505 A.2d 113. Writing for the unanimous Court, Chief Judge Murphy explained that "the punitive damages recoverable under this section may not exceed threefold the amount of the security deposit withheld without a reasonable basis by the landlord, plus reasonable attorney's fees." *Id.* at 450, 505 A.2d 113. The Court then calculated the appropriate amount of the award, making it clear in the process that the total "compensatory plus punitive damages" recovery in such cases may not exceed three times the improperly withheld funds:

> The trial judge in this case found from the evidence that $67.50 of the $675 security deposit was incorrectly withheld, and, furthermore, that the entire $67.50 was withheld without a reasonable basis. Accordingly, **the amount of the judgment could not have been greater than $702.50 plus costs, calculated as follows: threefold the amount withheld without a reasonable basis ($67.50 × 3 = $202.50),** plus reasonable attorney's fees ($500).

*Id.* at 451, 505 A.2d 113 (emphasis added).

Though worded somewhat differently, we view the treble damage provision in LE section 3–507.1(b) as the employer-employee analog to the treble damages provision in RP section 8–203(h)(3)(ii). Both statutes create a civil remedy by which wrongfully withheld money can be recovered, along with litigation expenses and a substantial penalty that serves as an incentive for the payor not to stonewall without legitimate reason. We therefore find support for our construction of the

treble damages provision of the Wage Payment Act in the Court of Appeals' construction of Maryland's comparable statute permitting recovery of treble damages for wrongfully withheld security deposits.

We hold that the statutory damage formula when the trier of fact "finds that an employer withheld the wage of an employee in violation of [the Wage Payment Act] and not as a result of a bona fide dispute," and the court thereafter determines additional damages are appropriate, is as follows: "(amount of wrongfully withheld wages) × (3 or less)."

## B.

### Stevenson May Be The Prevailing Party With Respect To Her Wage Payment Act Claim Concerning Eligible Wages

We review the trial court's decision to award Stevenson attorney's fees under the Wage Payment Act for abuse of discretion and clear error. *See Friolo v. Frankel,* 373 Md. 501, 512, 819 A.2d 354 (2003). BB & T argues that the trial court erred in awarding Stevenson attorney's fees "because she was not the prevailing party at trial. By almost every measure, the Bank, not Ms. Stevenson, was the prevailing party."

BB & T's complaint focuses on the standard governing this type of attorney's fee award. BB & T defines "prevailing party" as "the party who prevails as to the substantial part of the litigation." *See Testa v. Village of Mundelein, Ill.,* 89 F.3d 443, 447 (7th Cir.1996). It interprets "substantial part" as a purely quantitative measure. Pointing out that "Stevenson sought nearly $1,500,000.00 in damages under the Wage Act[,]" the bank claims the victor should be measured solely by bottom line results. It argues, "Stevenson proved actual damages in an amount barely equal to one percent of the amount she sought, ... and recovered barely four percent[.]" We find the bank's "pure bottom line" standard too narrow. In *Friolo,* the Court of Appeals recognized that federal courts characterize a plaintiff as the prevailing party when she

"succeeds on any significant issue that achieves some of the benefit sought in bringing the action; he or she does not have to win it all to be regarded as prevailing." *Friolo,* 373 Md. at 523, 819 A.2d 354 (emphasis added)(reviewing *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Similarly, in *Brown v. Hornbeck,* 54 Md.App. 404, 412, 458 A.2d 900 (1983), this Court held that "plaintiffs may be considered the prevailing parties 'if a significant issue is resolved so as to achieve some of the benefit through litigation.' "

This is the standard that the trial court appears to have applied when it concluded that Stevenson was the prevailing party. For the same reasons we must vacate the Wage Payment Act judgment, however, we must also vacate the attorney's fee award. We decline to speculate on the outcome of any attorney's fee request after remand. On remand, the trial court will determine whether Stevenson is the prevailing party with respect those eligible wages that she may recover under the Wage Payment Act.

## C.

### Attorney's Fees May Be Awarded Only For Work Performed On Wage Act Issues

Stevenson complains that the trial court should not have excluded from the fee award expenses for legal work on whether her stock option earnings must be used to calculate Termination Compensation. *See* Part III *infra.* Based on our ruling that Stevenson may not recover unpaid Termination Compensation under the Wage Payment Act, the stock options issue is relevant only to the breach of contract claim. Because there is no attorney's fee provision in Stevenson's employment agreement, the remand court may not award Stevenson attorney's fees for work performed on that issue.

As discussed above, however, the court may award Stevenson reasonable fees and expenses that she incurred in successfully pursuing a claim under the Wage Payment Act. *See Friolo,* 373 Md. at 529–30, 819 A.2d 354 (fee award for

successful Wage Payment Act claim should be liberally granted). Below, we briefly review the method by which such a fee award should be determined.

## D.

### Determination Of Reasonable Attorney's Fees

Both parties challenge the manner in which the trial court determined the attorney's fee award. Stevenson argues that the trial court erred in setting the amount of those fees at one-third of the post-remittitur award for unpaid wages. In addition to misinterpreting and improperly relying on the contingency fee agreement between Stevenson and her attorneys, she asserts, the court also failed to follow the Court of Appeals' instructions in *Friolo* to use the lodestar method, adjusted on the basis of specific factors, and to "give a clear explanation of the factors [it] employed in arriving at the end result[.]" *See Friolo*, 373 Md. at 528, 819 A.2d 354 (court may not use proportion of judgment as sole mathematical basis for attorney's fee award, and may award amount that exceeds judgment in cases involving fee-shifting statute); *Blaylock v. Johns Hopkins Fed. Credit Union*, 152 Md.App. 338, 359, 831 A.2d 1120 (2003)(same). Finally, Stevenson complains that the award "was based in part on the belief that an attorney should not recover more than the client," a proportionality precept that "cannot be applied in cases involving a fee-shifting statute." *See Friolo*, 373 Md. at 528, 819 A.2d 354; *Blaylock*, 152 Md.App. at 359, 831 A.2d 1120.

On cross-appeal, BB & T complains that Stevenson's attorneys are not entitled to a fee that is several multiples of her actual damages. In its view, strict application of the lodestar analysis, although unnecessary, indicates that counsel was overcompensated.

Having vacated the attorney's fee award along with the Wage Payment Act judgment, we need not dissect it for each of these errors. On remand, the court may consider any fee request that reflects the limited nature of Stevenson's Wage

Payment Act claims following this appeal[15] and the proceedings on remand. For the guidance of the court and parties, we summarize the standards by which such an award should be made.

In *Friolo*, the Court of Appeals described the appropriate analysis in awarding attorney's fees pursuant to LE section 3–507.1(b). Although "[t]here is no statutory requirement that" a court must award reasonable counsel fees for a successful claim under the Wage Payment Act, "it is clear . . . that the Legislature intended that discretion to be exercised liberally in favor of awarding fees . . . in appropriate cases." *Friolo*, 373 Md. at 515, 819 A.2d 354.

■■ Stevenson is correct that a court may not determine attorney's fees by simply awarding a selected proportion of the compensatory judgment, or otherwise engaging in a cost-benefit analysis. *See id.* at 529, 819 A.2d 354; *Blaylock*, 152 Md.App. at 356, 831 A.2d 1120. Instead, the court should ordinarily begin its analysis using the lodestar approach—determining the number of hours reasonably expended on the litigation, then multiplying those hours by a reasonable hourly rate. *See Friolo*, 373 Md. at 512, 819 A.2d 354. This creates an objective basis for an estimate of the value of services provided by counsel. *See id.* at 523, 819 A.2d 354.

■■ From there, reductions may be taken for a variety of reasons, including inadequate documentation of hours and work that is duplicative, excessive, unnecessary, or unsuccessful. *See id.* at 523–24, 528–29, 819 A.2d 354; *Hensley v. Eckerhart*, 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983). When the claimant has had only partial success, the court may refuse to award fees that were incurred on an unsuccessful claim that is unrelated to a successful claim. *See Friolo*, 373 Md. at 524–25, 819 A.2d 354. Other

---

**15.** The Court of Appeals has indicated that a judge may award fees incurred in an appeal from a Wage Payment Act claim. *See Pak v. Hoang*, 378 Md. 315, 336, 835 A.2d 1185 (2003); *Admiral Mortgage*, 357 Md. at 547, 745 A.2d 1026.

reductions to the lodestar amount may be based on the particular circumstances presented by the case, as measured by factors set forth in Rule 1.5 of the Maryland Rules of Professional Conduct.[16] *See id.* at 527 & n. 3, 529, 819 A.2d 354.

When doing so, however, the court must "make appropriate findings, so that the parties and any reviewing appellate court can follow the reasoning and test the validity of the findings." *Id.* at 529, 819 A.2d 354. It also must avoid using a strict "proportionality test" to judge the reasonableness of a fee request. *See, e.g., Blaylock,* 152 Md.App. at 355–56, 831 A.2d 1120 ("if attorney fee awards in [cases arising under fee-shifting statutes] do not provide a reasonable return, it will be economically impossible for attorneys to represent their client"). And it should not treat a contingency fee agreement as an automatic cap on the recovery of attorney's fees. *See Blanchard v. Bergeron,* 489 U.S. 87, 93, 109 S.Ct. 939, 944, 103 L.Ed.2d 67 (1989)(contingency fee agreement may aid court in determining reasonable amount of attorney's fees, but "does not impose an automatic ceiling on an award of attorney's fees"). On remand, the court should follow these

---

**16.** This Rule requires that "[a] lawyer's fee shall be reasonable" and lists the following "factors to be considered in determining the reasonableness of a fee":

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

guidelines and explain any adjustments it makes to the lode-star figure.

**JUDGMENTS VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ½ BY APPEL-LANT/CROSS–APPELLEE, ½ BY APPELLEE/CROSS–APPELLANT.**