SLOVITER, Circuit Judge,
dissenting.
Unlike my colleagues, I would affirm the judgment of the District Court as to both the breach of contract and fraud determinations. I would hold that the fact findings made by the District Court after a three-day bench trial were not clearly erroneous.
The majority’s decision rejecting the District Court’s holdings that MASH breached its contract and that MASH, Fried, and Vogel committed fraud is based on the majority’s interpretation of one phrase in one sentence in the contract. That phrase, which set the final sale price on the number of employees who remained “on ProLease Atlantic’s payroll” on the Recalculation Date, is ambiguous and should be construed in the context of the surrounding circumstances. The majority’s conclusion is reached without any discussion, much less analysis, of the unchallenged facts and circumstances.
I.
As the majority notes, ProLease Atlantic, a professional employer organization which like MASH hired its clients’ employees, leased them back to the client-companies, and provided payroll, tax and employee-benefit services to those companies, purchased substantially all of the assets of MASH. Those assets consisted of the number of “Eligible Employees” on MASH’s payroll at the time of closing, at the price of $1,250 each. ProLease Atlantic agreed to pay one-half of the purchase price at closing, and to provide a promissory note for the remaining balance. The Purchase Agreement also provided that if within 180 days following the close of the transaction (the “Recalculation Date”) ProLease Atlantic determined that less than 97% of the Eligible Employees remained on its payroll, the principal balance of the Promissory Note would be reduced by the product of $1,250 and the difference between 97% of the Eligible Employees represented at closing and the number of Eligible Employees on ProLease Atlantic’s payroll as of the Recalculation Date (the “Recalculation Formula”).
MASH, Fried and Vogel jointly and severally represented that (1) the Client List attached to the Purchase Agreement was correct and current; (2) there were no pending claims against MASH for federal, state and local taxes, and that all taxes which might accrue up to the closing date would be paid by MASH; (3) no material misstatements or omissions were made; and (4) all representations in the Purchase Agreement were made with the knowledge and expectation that ProLease Atlantic was placing substantial reliance thereon. MASH, Fried and Vogel further agreed to *135 indemnify ProLease Atlantic for up to four years following the closing for, inter aha, a breach of any of their warranties arising from the transaction. The Purchase Agreement entitled ProLease Atlantic to set off any amounts that MASH owed it against any amounts it owed on the Promissory Note.
At closing, MASH represented to Pro-Lease Atlantic that there were 3,307 Eligible Employees, yielding a purchase price of $4,133,750. ProLease Atlantic paid MASH $2,066,875 (one half of the purchase price) and executed a Promissory Note for the remaining $2,066,875. MASH also provided a “Reaffirmation of Seller’s Representations and Warranties,” by which it re-affirmed the representations and warranties contained in the Purchase Agreement.
On October 2, 2000, ProLease Atlantic made the first payment under the Promissory Note in the amount of $151,558.69. Thereafter, ProLease Atlantic discovered that MASH had breached many of the representations and warranties contained in the Purchase and Letter Agreements: (1) MASH, Fried and Vogel overstated the number of MASH’s Eligible Employees at the time of closing, thereby artificially inflating the purchase price (in fact, at the end of the Look-Back Period, ProLease Atlantic discovered that the number of Eligible Employees was far lower than the 3,307 represented by MASH in the Purchase Agreement); (2) ProLease Atlantic paid $6,132.92 in delinquent taxes attributable to one of MASH’s affiliates, despite representations that MASH would pay all taxes that might accrue prior to closing; (3) ProLease Atlantic overpaid health insurance premiums in the amount of $106,806.71 on behalf of PLC’s employees who by the terms of a Letter Agreement, were not part of the transaction; (4) MASH failed to disclose to ProLease Atlantic that it had instituted a policy whereby the employees of MASH’s clients were permitted to falsely designate their relatives and acquaintances as “employees” of MASH such that these individuals could be included on MASH’s health insurance policies (ProLease Atlantic continued to pay health insurance premiums for these individuals, who were not employees, after the transaction, resulting in a financial loss of $39,845.54); (5) Fried caused ProLease Atlantic to pay workers’ compensation premiums for PLC employees amounting to $45,935.62; and (6) ProLease Atlantic was not reimbursed for the $33,212 it expended in administering PLC’s payroll and benefits (an amount MASH had agreed to pay).
Because ProLease Atlantic did not pay further on the Promissory Note, MASH filed suit with multiple claims which were essentially reduced to a breach of contract claim against ProLease Atlantic and its fraud claim against ProLease Atlantic and its officers and employees. After a three-day bench trial, the District Court, in the portion of the order relevant here, found in favor of ProLease Atlantic on MASH’s breach of contract claim and found in favor of ProLease Atlantic on its set-off claim, see Mash Enterprises, Inc. v. ProLease Atlantic Corporation, No. 01-2437, 2004 WL 405794 (E.D.Pa. March 4, 2004) (hereafter cited as Mash Enterprises), and counterclaims for breach of contract, fraud and negligent misrepresentation. The remedy for the breach of contract, fraud and negligent misrepresentation claims were the same. The District Court determined that ProLease Atlantic did not owe MASH any amount under the Promissory Note, and, in fact, had overpaid in the amount of $2,540.
II.
The most significant of the District Court’s findings of fact for our purposes is *136 its finding that as of the Recalculation Date there were 1,853 Eligible Employees on ProLease Atlantic’s payroll, a far cry from the 3,307 represented by MASH in the Purchase Agreement. In reaching this figure the District Court relied on the testimony by ProLease Atlantic’s expert witness Charles S. Lunden. The majority discounts Mr. Lunden’s testimony for no reason that I can see. Lunden is a graduate of the University of Pennsylvania with a major in Accounting and is a Certified Public Accountant. He is accredited in Business Evaluations by the American Institute of CPAs, he is a Certified Fraud Examiner, a Certified Life Underwriter and a Certified Management Accountant. He has testified as an expert in various State and Federal Courts as to Business Evaluations and measures of damages. See Mash Enterprises, 2004 WL 405794, at *6. Fried, although now employed by Pro-Lease Atlantic, testified in support of MASH. The District Court found that Fried’s method of calculation “was unreliable,” id. at *7, and that “Mr. Lunden’s conclusions are much more reliable.” Id. at *6. The basis for Lunden’s calculation is set forth fully in the District Court’s unreported opinion. Id. at *3-*5.
Significantly, MASH does not appeal from the District Court’s finding that MASH’s representation of the number of Eligible Employees was 1,454 employees too many. Nor does it dispute that Pro-Lease Atlantic was entitled to each of the various setoffs found by the District Court. Its sole argument is that the District Court erred in its construction of § 2(d) of the Purchase Agreement,[6] by excluding 268 Eligible Employees of employers Aquahab and Littman and Boca, Robinson-Pallet, South Jersey Paper, Trenton Corrugated and Ventresca (the “Disputed Companies”), from its calculation of the Eligible Employees as of the Recalculation Date. MASH contends that if these Eligible Employees were included in the Recalculation Formula, ProLease Atlantic would remain liable for $326,729.08 on the Promissory Note. MASH’s position is a telling admission of the extent of its initial representations, or more precisely, misrepresentations.
III.
Turning then to the 268 employees on whom the majority focuses, I would agree with the District Court’s determination for the following reasons:
A.

The Exclusion of 133 Eligible Employees of Aquahab and Littman

The District Court excluded 133 Eligible Employees of Aquahab and Littman (because Aquahab and Littman are affiliated companies, they will be referred to collectively as “Aquahab”) from the Recalculation Formula relying in large part on paragraph 2(f) of the Purchase Agreement, which provides that Prolease Atlantic has the right to terminate any Client Contracts prior to the Recalculation Date “for *137 the same reason that it terminates its own client contracts.”[7]
As a preliminary matter, it is significant that MASH plainly misstated the number of Aquahab’s Eligible Employees at closing. Whereas the submitted client list indicated that Aquahab had 325 Eligible Employees at closing, it is undisputed that there were only 133 Eligible Employees during the look-back period.
In early November 2000, ProLease Atlantic, having determined that its relationship with Aquahab was unprofitable (due to certain risk-management issues and Aquahab’s large ratio of part-time employees to full-time employees), orally terminated its client services contract with Aquahab. On November 6, 2000 Aquahab sent a certified letter to ProLease Atlantic confirming the termination of the contract, but requesting that ProLease Atlantic process its payroll until December 16, 2000. On November 29, 2000, ProLease Atlantic, unaware of the November 6, 2000 letter, sent a letter to Aquahab terminating their contract effective November 15, 2000 (thereby memorializing the earlier oral termination). On December 4, 2000, Pro-Lease Atlantic first became aware of Aquahab’s request in its November 6, 2000 letter, and by letter agreement dated December 5, 2000, agreed, as an accommodation to Aquahab, to process its payroll until December 31, 2000.
These undisputed facts plainly demonstrate that as of the Recalculation Date (November 28, 2000), Aquahab was not a client of ProLease Atlantic. The original contract was terminated effective November 15, 2000. Although ProLease Atlantic agreed to accommodate Aquahab’s request to process payroll until the end of the year, this letter agreement was consummated on December 5, 2000, after the Recalculation Date.
The majority sees “no basis” to exclude clients that were terminated prior to the Recalculation Date, so long as ProLease Atlantic was processing payroll for the client at the time of the Recalculation Date. Maj. Op. at---. Paragraph 2(f) of the Purchase Agreement, however, expressly and unambiguously contemplated that ProLease Atlantic might have a commercially reasonable need to terminate an unprofitable and risky client like Aquahab, and if that termination was not a disguised effort to reduce the money owed under the Promissory Note, it would eliminate the client’s employees from the tally of Eligible Employees within the meaning of the Purchase Agreement. Because the District Court correctly found no evidence of record to indicate that ProLease Atlantic terminated Aquahab “without cause solely to obtain a reduction in the amount of the Promissory Note,” I would affirm its exclusion of Aquahab’s 133 employees. The record is clear that ProLease Atlantic did not express a mere “intent” to terminate Aquahab; it in fact terminated Aquahab prior to the Recalculation Date, and only resumed processing Aquahab’s payroll until the end of the year by a separate agreement entered after the Recalculation Date.
*138 B.

The Exclusion of 135 Eligible Employees of Robinsom-P allot, Trenton Corrugated, South Jersey Paper and Ventresca

Robinson-Pallet, Trenton Corrugated, South Jersey Paper and Ventresca each notified ProLease Atlantic prior to the Recalculation Date that they intended to terminate their contracts with ProLease Atlantic. The District Court held that the 135 Eligible Employees of these companies should be excluded from the Recalculation Formula.[8]
The present dispute is based on the phrase “on the Buyer’s payroll as of the Recalculation Date” as used in § 2(d) of the Purchase Agreement. MASH contends that the plain meaning of the Purchase Agreement is clear, and that as of November 28, 2000 (the Recalculation Date), the employees of the Disputed Companies were irrefutably on ProLease Atlantic’s payroll, irrespective of whether they had voiced an intention to terminate their respective contracts prior to that date. ProLease Atlantic argues that the above-quoted phrase is ambiguous, and that the clear intention of the parties was to exclude employees from the Recalculation Formula who had voiced their intention, prior to the Recalculation Date, of terminating their relationship with Pro-Lease Atlantic, even if the termination was to occur after the Recalculation Date.
The question of whether contractual language is clear or ambiguous is a legal determination subject to plenary review. See, e.g., Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 53 n. 2 (3d Cir.2001) (explaining that “if the district court engages in contract construction, we exercise plenary review”); see also First Union Nat’l Bank v. Steele Software Sys. Corp., 154 Md.App. 97, 838 A.2d 404, 447 (2003) (“The determination whether contract language is ambiguous is a question of law for the court.”). The Purchase Agreement provides that Maryland state law governs its terms.
“[A] written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible to more than one meaning. The determination of whether language is susceptible of more than one meaning includes a consideration of the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.” Stevenson v. Branch Banking & Trust Corp., 159 Md. App. 620, 861 A.2d 735, 753 (2004) (quotation marks and citation omitted). If a provision is deemed ambiguous, the court shall determine the intent and purpose of the parties, and consider “the circumstances and conditions affecting the parties ... and their subsequent conduct and construction of the contract.” Anne Arundel County v. Crofton Corp., 286 Md. 666, 410 A.2d 228, 232 (1980).
In support of ProLease Atlantic’s argument that the unrebutted testimony at trial demonstrates that the phrase “on the Buyer’s Payroll” is ambiguous, it points to the testimony of Charles Ehrig, its Chief Financial Officer, that the methodology used to calculate the number of employees on the payroll as of the Recalculation Date *139 was to determine the number of employees who had been paid on any date during the month of November. According to Pro-Lease Atlantic, if § 2(d) was strictly interpreted, and the appropriate calculation was the number of employees on payroll as of the specific Recalculation Date, then based on the payroll records, only three employees would be “on the Buyer’s payroll” (i.e., the actual number of employees paid on November 28, 2000). Furthermore, Balaji Ramamoorthy, ProLease Atlantic’s sole shareholder, testified that the payroll register inevitably included inactive and terminated employees who had long since ended their affiliation with ProLease Atlantic’s clients. Therefore, to interpret the term “payroll” literally would improperly include these ineligible employees into the Recalculation Formula.
According to ProLease Atlantic, the intention of the parties was that the Reduction Formula exclude employees associated with clients who had stated their intention to cease transacting business with Pro-Lease Atlantic, even after the Recalculation Date. The District Court agreed, although it did not make any explicit finding that the provision was ambiguous.
ProLease Atlantic’s interpretation is reasonable and consistent with the character and purpose of the contract. The Reduction Formula was primarily intended to protect ProLease Atlantic against 1) overstatements in the number of Eligible Employees at closing, and 2) client attrition during the 180-day period following the closing. Because the most valuable assets of Professional Employer Organizations are their client employees, it is reasonable to exclude those clients who will not remain on ProLease Atlantic’s payroll after the Recalculation Date, so long as they have voiced their intention of terminating the contract before the Recalculation Date.
Unlike the majority, I would give due deference to the District Court’s findings, and exclude all of the 268 disputed Employees from the Recalculation Formula. See Coca-Cola Bottling Co. v. Coca-Cola Co., 988 F.2d 386, 401 (3d Cir.1993) (“The intent of the parties to ambiguous provisions in a contract is, however, a question of fact that an appellate court can set aside only if it is clearly erroneous.”).
IV.
Vogel and Fried argue that the evidence was insufficient to support the District Court’s finding that they knew that any of the above listed representations were false, or that they were recklessly indifferent in making them.
It is well settled under Maryland law that fraudulent intent “may be inferred from the facts and circumstances accompanying the particular transaction.... In other words, knowledge, like intent, is a state of mind generally to be inferred from the person’s conduct viewed in light of all accompanying circumstances.... [T]he state of one’s mind is always a question of fact, and being subjective in nature, proof thereof is seldom direct, but is usually inferred from proven circumstances.” Pearson v. Maryland, 8 Md.App. 79, 258 A.2d 917, 922 (1969); see also First Union Nat’l Bank, 838 A.2d at 440 (noting that “fraudulent intent can be inferred from circumstantial evidence”).
The District Court concluded that:
When one considers the extent of the inaccuracy in the eligible employee Client List the conclusion is inescapable that Counter Defendants had to have done that knowingly. It is also clear that these misrepresentations/non-disclosures were reasonably relied upon by ProLease Atlantic in making its decision to purchase HRO’s assets because they were the basis upon which the purchase *140 price was computed. ProLease Atlantic was substantially damaged by its reliance upon Counter Defendants misrepresentations/non-disclosures because as a result of these ProLease Atlantic drastically overpaid under the Purchase Agreement.
App. at 30.
The District Court’s conclusion should survive our review for clear error. See Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 359 (3d Cir.2002). As noted by the District Court, there was a huge disparity between the number of Eligible Employees represented at closing (3,037), and the number of Eligible Employees who were on the payroll as of the Recalculation Date (1,853). Even excluding the 268 Eligible Employees of the Disputed Companies, this leaves an overstatement of 916 Eligible Employees as of the closing date — a figure which is not contested by Fried and Vogel. This difference, quite plainly, could not be accounted for by ordinary attrition. Given that Fried and Vogel were the only two shareholders of MASH, and thus intimately familiar with MASH’s day-to day business, the District Court did not clearly err by concluding that these gross overstatements in the number of Eligible Employees were made with knowledge of their falsity or reckless disregard for their truth.[9] This conclusion is only bolstered by the fact that MASH failed to provide any expert testimony to rebut that of ProLease Atlantic, or to contest the validity of any of the other alleged false representations identified in the Purchase Agreement.
V.
For the reasons set forth above, I would affirm the District Court’s fact findings both with respect to the breach of contract and the fraud.

. Section 2(d) of the Purchase Agreement provides that:
In the event that within one hundred eighty (180) days following the Closing (the "Recalculation Date"), the Buyer determines that less than ninety-seven (97%) of the Eligible Employees ... are then on the Buyer’s payroll, the outstanding value of the promissory Note shall be reduced by an amount (the "Reduction Amount”) equal to the product of (i) [$1,250] and (ii) the difference between (1)[97%] of the Eligible Employees (the “97% Figure”) and (2) the number of Eligible Employees on the Buyer's payroll as of the Recalculation Date.
App. at 90-91 (emphasis added).

. Paragraph 2(f) of the Purchase Agreement provides in relevant part:
On or before the Recalculation Date ... [ProLease Atlantic] shall deal with the client contracts ... using the same commercially reasonable business practices as it has used in the past with respect to its own client contracts (i.e., [ProLease Atlantic] shall not wilfully and purposefully termínate any client contracts without cause solely to obtain a reduction in the amount of the Promissory Note, but shall have the right to terminate client contracts ... for the same reason that it terminates its own client contracts (e.g., default by a client under a contract, and any risk management issues (credit risk, workmen’s comp risk, unemployment risk, etc.)).

. It should be noted that during trial, Fried testified that at the time of the execution of the Purchase Agreement, Ventresca was actually a client of PLC and that between the time of the execution of the Purchase Agreement and the closing, MASH transferred Ventresca to MASH's payroll, without informing Pro-Lease Atlantic. Because Ventresca was actually a client of PLC, and because ProLease Atlantic did not purchase any of the employees of PLC, the employees of Ventresca were never Eligible Employees. Thus, unlike the majority, see Maj. Op. at-n. 2, I see no unresolved issue as to whether employees of Ventresca should be counted as Eligible Employees.

. Fried testified that there were 3,037 Eligible Employees as of the closing date. Given the undisputed fact that this figure overstates the number of Eligible Employees on the Recalculation Date (only 180 days later) by at least 916 employees, one can logically deduce that the difference in these numbers can only be attributed to a misstatement of the number of employees on the client list. Given the surrounding circumstances, these statements could give rise to a finding of fraud and negligent misrepresentation.